UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| – against – | **MEMORANDUM & ORDER** |
| GREGORY SCARPA, JR., | 94-CR-1119 (ERK) |
| Defendant. | |

KORMAN, *J.*:

On April 19, 1995, Timothy McVeigh detonated a bomb in front of the Alfred P. Murrah Federal Building in Oklahoma City, killing 168 people, including 19 children. The blast was the culmination of a plan hatched chiefly by McVeigh and a co-conspirator named Terry Nichols. Ultimately, the two men were tried and convicted of various crimes, including first-degree murder. McVeigh was executed. Nichols was sentenced to life in prison. While serving his sentence in the maximum-security prison in Florence, Colorado, Nichols informed the occupant of a nearby cell, Gregory Scarpa, Jr. ("Scarpa" or "the defendant"), that he had hidden an additional cache of explosive components before the bombing, which had been intended for use in another attack. Shortly thereafter, on March 3, 2005, Scarpa conveyed that information to an FBI special agent, who took no action based upon it. Nevertheless, less than a month later, this time apparently pushed by a Congressman who had received information from persons acting on Scarpa's behalf, the FBI conducted a consent search of Nichols's former home and located and removed the explosives. Because the explosives had not been found earlier during a search undertaken in the aftermath of the bombing, the Associated Press reported that "[t]he extraordinary discovery, just three weeks from the 10th anniversary of the bombing of the federal building in Oklahoma City

1

. . . [was] likely to prove a new embarrassment to an FBI already burned by missteps in this case and the pre-Sept. 11 period." *FBI Finds Explosives in Home Where Terry Nichols Lived*, USA TODAY (Apr. 1, 2005); *see also id.* (quoting Dan Defenbaugh, the retired FBI agent who ran the Oklahoma City investigation, who was dismayed that his agency may have missed the evidence and stated, "When you do a search warrant of that importance, you have to make sure it's thorough."); *FBI at First Dismissed Tip on Nichols Explosives*, NBC News (Apr. 14, 2005), http://www.nbcnews.com/id/7505601/ns/us_news-crime_and_courts/t/fbi-first-dismissed-tip-nichols-explosives/#.Vly-83arS71. Indeed, "[t]his episode was serious enough to precipitate an investigation [by a congressional committee] to determine what else may have been missed or mis-analyzed in the original bombing probe." Pet'r's Mem. Supp. A.22 (Chairman's Report, Oversight and Investigations Subcommittee of the House International Relations Committee), Mar. 26, 2009.

Scarpa, son of the infamous Colombo crime family enforcer Gregory Scarpa, Sr., has been designated to serve the remainder of his sentence at a state prison facility, where his prisoner "evaluations have exceeded expectations" and his adjustment "has been well above that of the typical maximum custody offender." *See* Letter Attach., Feb. 27, 2015 (Status Update Report). Scarpa is suffering from Stage IV nasopharyngeal squamous cell cancer for which he has had multiple surgeries and has undergone chemotherapy and radiation treatments. *See* Fourth Addendum to Presentence Investigation Report 2, July 15, 2015, ECF No. 951. The relative five-year survival rate for a person with this type of cancer is thirty-eight percent.[1] Scarpa's incarceration results from his convictions, after a 1998 jury trial, for violating the Racketeer Influenced and Corrupt Organizations statute and for committing a series of related offenses. He was sentenced to 482 months in prison and is not projected to be released, even if he were to

---

[1] *Survival Rates for Nasopharyngeal Cancer by Stage*, American Cancer Society, http://www.cancer.org/cancer/nasopharyngealcancer/detailedguide/nasopharyngeal-cancer-survival-rates (last updated Mar. 3, 2015).

survive long enough to collect all available good time credit, until 2035. He would then be 84 years old.[2]

After his conviction was affirmed, *United States v. Scarpa*, 4 F. App'x 115 (2d Cir. 2001), Scarpa filed a *pro se* petition for a writ of habeas corpus. The case was reassigned to me on October 11, 2006, and I appointed counsel for Scarpa on November 16 of that year. Scarpa ultimately made clear, through counsel, that he was "willing to forego" his habeas claims in order to focus on his petition for a "downward adjustment of his sentence" under Fed. R. Crim. P. 35(b) ("Rule 35(b)") based on his "ongoing efforts to offer his substantial assistance." Pet'r's Mem. Supp. 4–5. According to his attorney, "at bottom, it really is about sentencing. . . . That's the issue [ ] we were really pressing." Hr'g Tr. 28, Aug. 5, 2010. Hearings on this and related issues were conducted on August 5, 2010, February 22, 2012, and November 20, 2012.[3]

## BACKGROUND

In 1988, Scarpa was charged with a RICO conspiracy in violation of 18 U.S.C. § 1962(d) and related substantive offenses for operating a drug trafficking enterprise as part of the Colombo organized crime family. He was convicted and sentenced by Judge Glasser to the statutory maximum of twenty years. Scarpa was then indicted again in 1995 for another violation of 18 U.S.C. § 1962(d), this time for yet another RICO conspiracy and for substantive offenses related to his operation of gambling, narcotics, and loan sharking businesses, as well as for tax fraud. Pet'r's Mem. Supp. 1, 6. After a jury trial, he was found guilty of a single count of violating 18 U.S.C. § 1962(d) for conspiracy to commit murder and of financing extortionate extensions of

---

[2] The Centers for Disease Control and Prevention report that the average life expectancy for a sixty-five-year-old American man is approximately 18 years. *Older Persons' Health*, Centers for Disease Control and Prevention, http://www.cdc.gov/nchs/fastats/older-american-health htm (last updated Sept. 30, 2015).
[3] The delay in resolving this case was due in large part to the adjournments requested by the parties in making and responding to various submissions. Indeed, their submissions have not yet reached an end.

3

credit, conspiracy to make those extensions, conducting an illegal gambling business, and conspiracy to defraud the United States in the collection of income taxes.

While awaiting trial on the second indictment, Scarpa was incarcerated at the Metropolitan Correctional Center in New York. During this time, he contacted the U.S. Attorney concerning information that he claimed to have obtained from a fellow prisoner, Ramzi Yousef, who had been indicted for his participation in the first World Trade Center bombing. Despite Scarpa's purported cooperation with the federal authorities to obtain intelligence about Yousef over a period of almost a year, Hr'g Tr. 39, Aug. 5, 2010, the U.S Attorney determined that his assistance was part of "a scam" intended to send the government "on a variety of wild goose chases," and refused to move for a reduction of his sentence, St'g Tr. 37:22–23, 18:3, May 7, 1999. At sentencing for Scarpa's 1998 convictions, Judge Raggi, without specifically finding that Scarpa had been engaged in a scam, determined that the U.S. Attorney had not acted in bad faith in refusing to move for a reduction based on the Yousef cooperation. St'g Tr. 37:21–38:1. She then sentenced Scarpa to a 482-month term of incarceration, to run consecutively to the previously imposed twenty-year sentence. *See id.* at 113:13–23. While she observed that Scarpa was not convicted of a murder in this case, she determined that his overall conduct and prior record were sufficiently serious so as to warrant the sentence she imposed. *See id.* at 64:1–2, 110:7–12.

In 2005, Terry Nichols moved into a cell near Scarpa at the maximum-security prison in which he was then incarcerated. Pet'r's Mem. Supp. 15, A.7 (Scarpa Aff. ¶ 9). Eventually, Scarpa persuaded Nichols to provide information about the cache of explosives that Nichols told him he had hidden in the house where he lived at the time of the Oklahoma City bombing. Scarpa then asked officials at the prison if he could speak with law enforcement regarding the information he had acquired. *Id.* at A.7 (Scarpa Aff. ¶ 9). When he received no response, he reached out to Dr. Stephen Dresch and Angela Clemente, private forensic investigators. On March 1, 2005, Dr.

4

Dresch called the Detroit office of the FBI and summarized the information he had received from Scarpa. *Id.* at A.17 (Dresch Aff. ¶ 5). Two days later, FBI Special Agent Andrew Stearns interviewed Scarpa. The next day, he returned with an FBI polygraph expert who conducted a polygraph examination. *Id.* at A.18 (Dresch Aff. ¶ 7). According to Special Agent Stearns, the expert "determined that Scarpa had exhibited deception when questioned about the information that he was providing to the FBI." Stearns Aff. ¶ 6, Nov. 19, 2012. Stearns, however, never explained the basis for the conclusion that Scarpa was deceptive, nor did he provide the specific facts as to which Scarpa was less than truthful. Indeed, the polygraph expert who administered the test has not submitted an affidavit in this case. Significantly, within thirty days of the initial interview with Scarpa, the FBI in fact acted on his information and discovered the explosives.

The search of Nichols's former home resulted from efforts made on Scarpa's behalf, which began on March 10, 2005 when Dr. Dresch interviewed Scarpa about the Nichols information. After several unsuccessful attempts to pass the intelligence along to the authorities, Dr. Dresch contacted Congressman Dana Rohrabacher, then Chairman of the Oversight and Investigations Subcommittee of the House International Relations Committee, Pet'r's Mem. Supp. A.20 (Dresch Aff. ¶ 14), and the latter "pressed the FBI to take action on this tip," *id.* at A.23 (Letter from Congressman Rohrabacher). On March 31, 2005, FBI Special Agents Eric B. Smith and Darryl Presnell conducted a search of Nichols's former home in Herington, Kansas, and located the explosives. *Id.* at A.22; Letter 1, Aug. 15, 2014. The U.S. Attorney concedes that the information leading to the discovery came from Scarpa. Letter 1, Aug. 15, 2014.

When Scarpa's attorney at the time, Neil Checkman, contacted the U.S. Attorney's Office in May and June 2005, he was told that the office was "not interested in affording Mr. Scarpa any relief by way of Rule 35, even if [Scarpa] had provided the information that led to the FBI's discovery of the explosives" because Scarpa's "information and sources were suspect" and

5

because he had provided bad information in the past. Pet'r's Mem. Supp. A.10–11 (Checkman Aff. ¶¶ 2–4). Subsequently, in his March 16, 2006 *pro se* supplement to his habeas petition, Scarpa made his first docketed request for Rule 35(b) relief based upon his cooperation in the Nichols matter. Suppl. Habeas Mot. 2. The response to the *pro se* supplement was that "there was no factual basis to justify the filing of a Rule 35 motion." Letter 2, Apr. 21, 2006. Since then, Scarpa's current counsel has made the request for Rule 35(b) relief in her multiple submissions to the court.

This memorandum addresses Scarpa's claim that he is entitled to some consideration for the assistance that enabled the FBI to discover and seize explosives not located in its initial search of the home in which Nichols had lived.

## DISCUSSION

The Federal Rules of Criminal Procedure prescribe the procedures for obtaining a reduction of sentence based on a defendant's substantial cooperation after the imposition of sentence. A motion by the government is the threshold requirement for a reduction. Fed. R. Crim. P. 35(b). If a motion is made within a year of sentencing, it need only be based on a defendant's substantial cooperation. By contrast, to the extent here relevant, "[u]pon the government's motion made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved: information not known to the defendant until one year or more after sentencing." *Id.* § (b)(2)(A).

The decision whether to file a motion for reduction of sentence based on the defendant's cooperation, whether under Sentencing Guidelines § 5K1.1 or Fed. R. Crim. P. 35(b), is "generally" left to the discretion of the government. *United States v. Rexach*, 896 F.2d 710, 713 (2d Cir. 1990).[4] Nevertheless, that discretion is not entirely immune from judicial review. Indeed,

---

[4] Because of the "similarity of language and function" of Section 5K1.1 and Rule 35(b), the same principles of interpretation apply to both. *United States v. Gangi*, 45 F.3d 28, 30–31 (2d Cir. 1995). Consequently, in discussing Rule 35(b), I also rely on cases in which the government has failed to make a motion pursuant to Section 5K1.1.

in *Wade v. United States*, 504 U.S. 181 (1992), the Supreme Court accepted a concession by the Solicitor General to this effect. *Id.* at 186 ("As the Government concedes, *see* Brief for United States 26 (citing *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam)), Wade would be entitled to relief if the prosecutor's refusal to move was not rationally related to any legitimate Government end."); *see also United States v. Roe*, 445 F.3d 202, 207 (2d Cir. 2006) (quoting *Wade*, 504 U.S. at 186); *United States v. Wilson*, 390 F.3d 1003, 1009 (7th Cir. 2004) (holding that "the government's refusal to file a Rule 35(b) motion lacked a rational relationship to some legitimate government objective."). An obvious example of such a refusal would be one based on an unconstitutional motive, such as the defendant's race or religion. *Wade*, 504 U.S. at 186. Ultimately, as the Supreme Court said in *Wade*, the decision not to move for a sentence reduction should be based on a "rational assessment of the cost and benefit that would flow from moving" and not on "a failure to acknowledge or appreciate [the defendant's] help." *Id.* at 187. I conclude that a rational assessment of the cost and benefit that would flow from moving for Rule 35(b) relief was not made here. Instead, reliance has been placed on an affidavit from the FBI agent who responded to Scarpa's initial request to supply information. This affidavit was concededly factually inaccurate in material respects and otherwise so vague as to make it impossible to judge its validity.

Moreover, the AUSA has also given a series of conflicting reasons for the refusal to seek Rule 35(b) relief, which do not survive careful analysis. These reasons, given at various times, may be summarized as follows: (i) while Scarpa was the source of the information that led to the uncovering of the explosives, he somehow also took false credit for that information and his alleged embellishment of it wasted a significant amount of government resources of an unspecified nature; and (ii) he has repeatedly obstructed justice in the past through committing perjury at his own trial, through providing testimony in support of his former criminal associates, which at least

7

one judge found not to be credible, *see, e.g.*, *United States v. Orena*, 299 F. Supp. 2d 83, 84 (E.D.N.Y. 2004), and through his alleged "sham" cooperation in the Yousef case.

Before evaluating these reasons, I observe at the threshold that the U.S. Attorney has not alleged that the information provided by Scarpa was not substantial. More significantly, even if that premise were challenged, this is not a case in which the prosecution is uniquely well-situated to evaluate the defendant's cooperation. The Supreme Court case supporting the government's discretion to refuse to move for Rule 35(b) relief, *Wade v. United States*, 504 U.S. 181 (1992), is premised in part on the notion that the government deserves deference because it is well-suited to evaluate the defendant's cooperation. *Id.* at 187 (citing *United States v. Doe*, 934 F.2d 353, 358 (D.C. Cir. 1991), and *United States v. La Guardia*, 902 F.2d 1010, 1016 (1st Cir. 1990), the holdings of which rely on the "reasonable assumption that the government is best positioned to 'supply the court with an accurate report of the extent and effectiveness of the defendant's assistance,'" *Doe*, 934 F.2d at 358 (quoting *La Guardia*, 902 F.2d at 1015)).

The logic of *Wade*, *Doe*, and *La Guardia* fails where, as is the case here, the government is not in the appropriate position to provide information about the cooperation or, even worse, actively "balk[s]," *La Guardia*, 902 F.2d at 1016, at providing such information, leaving the court as the more appropriate evaluator of the value of the defendant's substantial assistance. *See, e.g.*, *United States v. Kaye*, 140 F.3d 86, 88 (2d Cir. 1998) (noting, in rejecting the availability of 5K1.1 relief for providing assistance to state authorities, that "the Assistant United States Attorney would have no advantage over the court in evaluating the defendant's cooperation"); *United States v. Knights*, 968 F.2d 1483, 1488 (2d Cir. 1992) (while "[t]he district court is of course obliged in most cases to allow considerable deference to the government's evaluation of a defendant's cooperation," in some cases, "the district court is well-situated to review [it]"); *United States v. Copeland*, No. 96-6043, 1997 WL 563141, at *4 (4th Cir. Sept. 11, 1997) (weighing, in affirming

8

a district court's overturning the prosecution's refusal to move for Rule 35(b) relief, that "[t]he court was in a unique position to judge [the defendant's] cooperation.").

Nevertheless, it does not require special expertise to evaluate the defendant's cooperation here, which involved a matter relating to public safety. Particularly, at a time when we live under the threat of domestic terrorism, providing information that leads to the discovery of explosives planted by one who had engaged in such terrorism should clearly come within the definition of substantial assistance. Again, I do not understand the U.S. Attorney to argue otherwise.

Finally, and quite significantly, the U.S. Attorney has been willing in the past to grant cooperation credit even to defendants who have committed serious crimes and have lied repeatedly during the course of their cooperation. *See, e.g.*, *United States v. Omura*, 99-cr-00095 (ERK) (E.D.N.Y. Aug. 11, 2006) (Section 5K1.1 letter provided for a defendant who breached two cooperation agreements and lied about his involvement in the planning and cover-up of the homicide at issue in the prosecution in which he was cooperating). I address this further below.

With those points in mind, I now discuss in greater detail the justifications offered for the refusal to grant sentencing relief.

I. Scarpa's Cooperation in the Nichols Case.

The U.S. Attorney has claimed at varying times that Scarpa was not the source of the information that led to the discovery of the explosives, that he took false credit for someone else's information, and that he embellished the information, resulting in a substantial waste of federal resources in the attempt to investigate the information provided. After examining the transcripts of hearings that occurred on August 5, 2010, February 22, 2012, and November 20, 2012, and all of the submissions in this case, I find that support is lacking in the record for these explanations.

I begin with the substantive claims regarding Scarpa's allegedly flawed assistance in the Nichols matter. At the February 22, 2012 hearing, the AUSA declared that Scarpa had acquired

the information from an unnamed source, purportedly by claiming that he could help the other source obtain a reduction in his sentence. Hr'g Tr. 15–16, Feb. 22, 2012. She then asserted that the unnamed source "subsequently brought a complaint; hey, this guy, you know, scammed me." *Id.* at 16. Passing over the fact that this is simply unsupported double-hearsay, this complaint has never been mentioned again and is inconsistent with the later acknowledgement that the AUSA was not relying on the fact that Scarpa was somehow taking false credit for providing the information. Hr'g Tr. 70–71, Nov. 20, 2012. Next, the AUSA claimed that Scarpa had embellished the information, warning of an imminent attack involving the hidden explosives, and that a substantial amount of resources had been expended in looking into that prospect. No proof was ever offered to substantiate that assertion. Indeed, when pressed to do so, the AUSA gave the following substance-less response:

> Court: Is there anything in the record that [supports that assertion]—
> Assistant United States Attorney: No, your Honor. . . . And the government does not want to . . . place that into the record because . . . it empowers Mr. Scarpa.

Hr'g Tr. 21–22, Feb. 22, 2012. No explanation was given as to exactly how such proof would "empower" Scarpa. Nevertheless, the AUSA has persisted in putting forth the contention that Scarpa had been lying, noting at the most recent hearing, "He's embellishing. He's embellished in a way that cost the government money." Hr'g Tr. 13, Nov. 20, 2012.

Because of my skepticism about the lack of any factual basis for these claims, most of which were based on information received from the FBI rather than on personal knowledge, I asked to be provided with an affidavit from the FBI agent ("the FBI affidavit" or "the affidavit") who made the initial contact with Scarpa on March 3, 2005. It was not until eight months after that request was made and after numerous excuses were offered for the delay, that the FBI special agent provided a four-page affidavit that included a number of unsupported statements—including some which were demonstrably inaccurate. Thus, he asserted that "Scarpa implied that the

explosives were intended for a future bombing," Stearns Aff. ¶ 4, Nov. 19, 2012, and that Scarpa "would only divulge the specific details to an individual with 'Congressional approval' to conduct conspiratorial investigations against the government," *id.* ¶ 5. The affidavit also claimed that FBI agents had obtained a search warrant for Nichols's home, but that "[t]he information underlying the search warrant application was not information that Scarpa had provided to the FBI." *Id.* ¶ 7. Rather, "the source of the information was a private investigator to whom Scarpa had previously relayed information regarding the hidden explosives." *Id.* Moreover, the affidavit indicated that subsequent "[i]nterviews of witnesses revealed that Scarpa had fabricated portions of the information that he previously provided to the FBI." *Id.* ¶ 9.

These assertions are flatly incorrect in material respects. First, it was not true that that the FBI had obtained a search warrant for Nichols's home and that the evidence underlying the warrant was from a source other than Scarpa. The search of Nichols's home was a consent search and was conducted without a warrant. Consequently, any reference either to the contents of the warrant or the application for the warrant is fictional. Perhaps more disturbingly, even though the AUSA had repeatedly referred to the existence of the warrant in reliance on the information she received from the FBI affidavit, I was not advised by her until twenty-one months after the affidavit was filed that, in fact, the search was not conducted pursuant to a warrant. Letter 1, Aug. 15, 2014. Notwithstanding contemporaneous published reports that the FBI had searched the home based on consent,[5] no explanation was offered in the letter or subsequently for this serious misstatement of fact. Significantly, this letter came a week after I formally directed the U.S. Attorney to provide me with the search warrant application that would necessarily have disclosed the source of the information regarding the location of the explosives and corroborating evidence of its reliability.

---

[5] *See, e.g., FBI Finds Explosives in Home Where Terry Nichols Lived*, USA TODAY (Apr. 1, 2005), http://usatoday30.usatoday.com/news/nation/2005-04-01-nichols-search_x htm.

This is not the only aspect of the FBI affidavit that is problematic. Specifically, it claimed that Scarpa "implied that the explosives were intended for a future bombing," Stearns Aff. ¶ 4, and that "the threat of another bombing" was "fabricated," *id.* ¶ 9. Passing over the somewhat vague allegation that Scarpa "implied" that the explosives were intended for a future bombing, a term that suggests that Scarpa actually never said as much, Scarpa submitted an affidavit in which he said that he told the FBI agent that Nichols had hidden the explosives in 1995 "for a future bombing at that time" and that Scarpa was "not attempting to 'imply' anything about a specific future threat in 2005, as Agent Stearns reported." Scarpa Aff. ¶ 22, Apr. 2, 2013, ECF No. 1025. Scarpa's explanation seems far more plausible than the vague allegations made in the flawed affidavit.

The claim that Scarpa would only disclose the information to a government-conspiracy investigator is on equally uncertain ground. In his sworn affidavit, Scarpa alleges that he had in fact stated that *Nichols* would only release the information if Scarpa could convince him that he was working with such an investigator. *Id.* ¶ 23. Moreover, Stearns claimed that Scarpa would not obtain the exact location of the explosives from Nichols without being provided a cooperation agreement. Stearns Aff. ¶ 5. But, in his sworn statement, Scarpa asserts that the reason he could not provide the location of the explosives at the time of his interview was that he had not yet managed to obtain that information from Nichols. Scarpa Aff. ¶ 24. This was corroborated by Emilio Bravo, the other inmate who was helping Scarpa try to acquire information from Nichols. Bravo Aff. ¶¶ 3, 8, Mar. 26, 2013, ECF No. 1025. Moreover, even if Scarpa sought such an agreement as a condition to providing the location of the explosives, this is hardly an unusual occurrence. Indeed, the U.S. Attorney enters into such agreements on a regular basis and does not suggest that, if he had been approached by an attorney representing Scarpa who offered to provide the information at issue here, he would not have agreed to some sentencing consideration. In any event, Scarpa ultimately provided the information without such an agreement.

The FBI affidavit also claimed that Scarpa "had exhibited deception when questioned [by an FBI polygraph expert] about the information that he was providing to the FBI." Stearns Aff. ¶ 6. Significantly, as I previously noted, the affidavit fails to disclose any details about the facts as to which Scarpa had exhibited deception, nor has an affidavit been submitted from the polygraph expert who administered the test—an omission which is particularly significant since it ultimately turned out that explosives were found by other FBI agents in Nichols's house less than thirty days later and that this discovery was admittedly based on information that Scarpa provided.

In addition to the inaccuracies in the FBI affidavit that provides the principal basis for the opposition to Scarpa's present motion, some of the AUSA's other assertions are equally vague and not supported by the facts. Specifically, the argument that Scarpa's embellishment caused the FBI to waste significant resources is not supported by any factual allegations as to the manner in which resources were wasted. Indeed, the FBI concededly failed to act on his information in early March 2005—apparently until it faced prodding from a member of Congress, after which it was able to locate the explosives within a month of the interview with Scarpa—and, by the government's own admission, it did not receive any further information from Scarpa that might lead to more inquiries after the explosives were discovered on March 31, 2005. *See* Stearns Aff. ¶¶ 6, 8.

Finally, the AUSA has failed to support her claim that Scarpa acquired the intelligence from an unnamed third party. Instead, she admitted that "the origin of the information [that led to the cache of weapons] was from Scarpa." Letter 1, Aug. 15, 2014. She has failed to substantiate and later elected not to rely on the accusation about Scarpa taking false credit for the information. *See* Hr'g Tr. 70–71, Nov. 20, 2012 ("I still maintain he may [have] obtain[ed] false credit but we did not go down that road with [the Stearns] affidavit. . . . He was taking false credit but that's—we're not relying on that.").

I am thus presented with an apparent case of the AUSA relying on faulty and inaccurate information provided by the FBI to deny Scarpa sentencing relief based on his substantial assistance. Indeed, the cover letter from the AUSA accompanying the FBI affidavit observes that it is being submitted "in support of the government's response in opposition to [Scarpa's] motion." Letter, ECF No. 983. After the affidavit is discredited as sloppy, vague and, inaccurate in material respects, it cannot provide a rational basis for refusing to make a Rule 35(b) motion.

In sum, this is a case in which the significance of the information provided by Scarpa has not been challenged. Indeed, the FBI acted on the information provided *within less than a month*—and within just a few days after hearing from Congressman Rohrabacher's office—confirming that it had a pressing interest in the intelligence Scarpa provided. The evidence thus indicates that the defendant provided information in this matter in a manner that was both truthful and forthright and that he did not engage in exaggeration or deliberate obfuscation.

## II. Scarpa's Past Relationship with the Government.

While it seemed to rely increasingly on the information provided by the FBI relating to Scarpa's cooperation in the Nichols case, the AUSA has also defended its refusal to file a Rule 35(b) motion by pointing to Scarpa's alleged past misrepresentations. In an April 28, 2010 letter, the AUSA claimed that, "in refusing to file a Rule 35(b) motion, the government is maintaining the integrity of [the] process of cooperation by not rewarding individuals such as the defendant who repeatedly attempt to pervert the criminal justice system." Letter 5. She pointed to the facts that the sentencing judge had applied an enhancement for obstruction of justice based on Scarpa perjuring himself at his trial, that Scarpa had offered "deceptive and dishonest" cooperation in the Yousef matter, and that he had filed "false affidavits" with courts in support of members of the Colombo family. *Id.* at 5–6. Indeed, at the August 5, 2010 hearing, the AUSA commented that "the government cannot take . . . someone who did nothing in our opinion [but] double deal and

14

lie to the government . . . and then turn around and say oh, but let's shake hands and make-up." Hr'g Tr. 22–23. At the February 22, 2012 hearing, she again remarked, "[A]bus[ing] the process of cooperation in attempts to get reductions of sentence in the past . . . [is] clearly a rational reason for the government not to grant this man a Rule 35," Hr'g Tr. 28, and "When can the government shut the door and say that we've given you all these chances and you've abused it at every turn? . . . [T]his is a man that's never come clean," *id.* at 35. Ultimately, according to the AUSA, "[b]ased upon the serious nature of the crimes to which the defendant was convicted, his commission of crimes while incarcerated, findings by two different district court judges that the defendant obstructed justice by committing perjury and the provision of sham cooperation, the government has a legitimate, rational reason to deny the defendant any reward for his cooperation." Letter 8, Apr. 28, 2010.

Passing over for the moment that the U.S. Attorney has supported reductions in sentence for cooperating defendants who have been guilty of the same sins that Scarpa allegedly committed, the circumstances here are somewhat unique. Certainly no one would quarrel with a decision by the U.S. Attorney not to enter into a cooperation agreement with such a defendant, if only because such conduct compromises his credibility and usefulness as a witness. Nor would one quarrel with a decision by the U.S. Attorney not to seek a reduction in sentence for a defendant who did not truthfully testify as he was obligated to do in his cooperation agreement. But this case involves none of these considerations. The issue is not whether the U.S. Attorney should enter into a cooperation agreement, a decision which is purely within the unfettered discretion of the U.S. Attorney, or whether the U.S. Attorney justifiably declined to provide a reward for a defendant who breached his cooperation agreement. *See, e.g.*, *United States v. Brechner*, 99 F.3d 96, 99–100 (2d Cir. 1996) (upholding the refusal to move for Rule 35(b) relief in part because the defendant was "lying to the prosecutor *during the period of his cooperation*"). Quite the contrary,

this is a case in which the cooperation offered by an incarcerated prisoner did not involve testimony at a trial in which his credibility was in issue. Nor is it a case in which the U.S. Attorney rejected the cooperation he offered. Instead, the information he offered was acted upon and turned out to be entirely accurate. Moreover, it was acted upon because it involved a serious issue of public safety.

Significantly, the U.S. Attorney for the Eastern District repeatedly, in the ordinary course, accepts cooperation—and credits such cooperation—from defendants who are guilty of the most serious criminal conduct and who have lied in the course of their cooperation. Thus, in one case to which I alluded earlier, the U.S. Attorney submitted to me a Section 5K1.1 motion on a cooperator's behalf notwithstanding that the cooperator breached *two* cooperation agreements. Specifically, first, during final preparation for the cooperator's trial testimony against a defendant, the cooperator "informed the government for the first time that he had been involved in a homicide." In the Section 5K1.1 letter, the U.S. Attorney wrote, "[a]s a result, the government was unable to call [the cooperator] to testify and the defendant . . . was acquitted." The cooperator also informed the U.S. Attorney that an individual named Pedro had killed a person named Robles, but the cooperator maintained he believed at the time that Robles was only to be robbed, not killed, and that he learned of the murder for the first time when one of the killers arrived at his house with the body. Nevertheless, the cooperator was permitted to plead guilty to this murder and continue cooperating. He thereafter admitted, contrary to his prior testimony, that he (1) had conspired with others to rob and murder Robles; (2) had taken the lead in cutting up the body; and (3) had said that a co-conspirator was not aware of the homicide prior to its occurrence when in fact that individual had authorized it. The foregoing breaches notwithstanding, the U.S. Attorney continued

16

to utilize the cooperator and made a Section 5K1.1 motion on his behalf.[6] *See United States v. Omura*, 99-cr-00095 (ERK) (E.D.N.Y. Aug. 11, 2006).

This is not the only case in which the U.S. Attorney has kissed and made up with a cooperator who lied or otherwise significantly breached a cooperation agreement. Nor is it the only case in which the U.S. Attorney has entered into cooperation agreements with and filed Section 5K1.1 letters for defendants who have committed heinous crimes—sometimes more serious than those of the defendant against whom they have testified. While the list is probably endless, Professor Leonard Orland details several such examples. *See Capital Punishment Trials of Mafia Murderers* 79–84 (2015). In one case, the jury declined to impose capital punishment on the defendant because the cooperating witnesses were thought to be "equally culpable" in the murder for which the defendant was convicted. *Id.* at 65.[7]

Nevertheless, I do not suggest that it would be irrational for the U.S. Attorney to conclude that, notwithstanding the value of a defendant's cooperation, his prior history simply does not justify any sentencing consideration. *But see United States v. Anzalone*, 148 F.3d 940, 941 (8th Cir. 1998) ("[T]he government cannot base its [§ 5K1.1 motion] decision on factors other than the substantial assistance provided by the defendant."). The problem is that the record suggests that the justification given here is simply a post-hoc rationalization rather than the real reason for the refusal to file a motion to reduce Scarpa's sentence. I base this judgment on the series of largely implausible, contradictory, and factually unsupported reasons that have been offered both by the AUSA and by the affidavit of the FBI special agent, as well as the fact that some of the reasons

---

[6] A redacted letter containing the foregoing facts from *Omura* was filed in *United States v. Pastrana*, No. 00-cr-1078 (ERK) (E.D.N.Y. Aug. 20, 2007), ECF No. 347, another case in which a defendant allegedly told less than the full truth during his cooperation and in which the U.S. Attorney ultimately agreed to make a Section 5K1.1 motion. This letter has been docketed at ECF No. 997.

[7] I do not intend to be critical of the practice of entering into cooperation agreements. On the contrary, based on my own experience as U.S. Attorney, I am keenly aware of the necessity of obtaining information and testimony from individuals involved in criminal activity. Indeed, the constraints placed on the evidence-gathering process make such otherwise distasteful agreements a necessity.

17

offered are inconsistent with the practice that the U.S. Attorney follows in cases in which defendants have cooperated, committed serious crimes, and even lied during their cooperation. Moreover, it is difficult to ignore the fact that the information Scarpa provided embarrassed the FBI because the explosives were not found during its initial search in the wake of the bombing and because the FBI agent who interviewed Scarpa did not follow up on the information he received. Again, it apparently took pressure from a member of Congress to get the FBI to undertake the search that led to the discovery of the explosives.

## CONCLUSION

The United States has an indisputably compelling interest in discovering and neutralizing stores of bombs hidden by domestic terrorists on American soil. It has an equally strong interest in encouraging the assistance of those individuals who happen to have information about such weapons. It does not, however, have *any* interest in making use of such truthful and accurate assistance, but arbitrarily failing to credit it based on unsubstantiated allegations. *Cf. United States v. Rexach*, 896 F.2d 710, 714 (2d Cir. 1990) (when a prosecutor fails to "fairly and even-handedly" exercise his discretion over Rule 35 motions, "valuable information and assistance" may be lost).

While I hold today that the reasons for denying Scarpa relief are not legally sufficient for purposes of denying Scarpa a sentencing reduction entirely, his prior record is very relevant to determining the *extent of the reduction*. *Cf., e.g.*, Transcript at 26:2–11, *United States v. Pastrana*, No. 00-cr-1078 (ERK) (E.D.N.Y. June 23, 2006), ECF No. 327; Sentencing Transcript at 12:5–25, 13:1–5, *United States v. Pastrana*, No. 00-cr-1078 (ERK) (E.D.N.Y. Oct. 24, 2008), ECF No. 357. Balanced against this consideration is the public interest in encouraging cooperation from incarcerated defendants who obtain information that implicates public safety. Cooperation with the government in general is fraught with risk to the individual cooperator. Indeed, the existence of the witness protection program itself is an acknowledgment of this risk. If anything, the risk

may be greater for an incarcerated defendant. Moreover, incarcerated individuals, as a group, are not motivated to provide assistance without some realistic hope of attaining some benefit. A modest sentencing reduction to an incarcerated defendant who has provided evidence that explosives were left by a domestic terrorist in a residential area is necessary to encourage others to come forward. This is the principal reason for my decision to reduce Scarpa's sentence by a period of ten years.[8]

Such a reduction does not diminish the seriousness of his prior criminal conduct or the need to deter him or others from committing crimes. Thus, by the time he is released, assuming he lives that long, he will have served the maximum sentence for his conviction for RICO conspiracy to commit murder—the most serious offense for which he was sentenced. And he would continue to serve additional time on the other sentences imposed to run consecutively to the sentence for RICO conspiracy—for a total of thirty-plus years on top of the twenty-year sentence imposed by Judge Glasser. I say "assuming he lives that long" because it is more likely than not that the nasopharyngeal squamous cell cancer from which he suffers, as well as the generally poor overall state of his health, *see* Fourth Addendum to Presentence Investigation Report, July 15, 2015, ECF No. 951, will take his life within five years.

Moreover, the record contains persuasive evidence of Scarpa's post-offense rehabilitation. Thus, the prison facility at which Scarpa is incarcerated advises that Scarpa has been an extraordinarily model prisoner. Letter Attach., Feb. 27, 2015 (Status Update Report). A brief portion of its report is worth quoting:

> Offender Scarpa's only job assignment has been that of Mentor in the Clinical Care Unit, which he has held since 6-13-2012. This position is considered one of the most responsible offender work assignments, as the duties involve working closely

---

[8] I offered the U.S. Attorney the opportunity to be heard on the issue of the extent of any reduction of Scarpa's sentence. The U.S. Attorney declined to do so even though I offered him that opportunity "without waiving any objections to a decision to reduce sentence in this case." Letter, ECF No. 1026. On the other hand, Scarpa's attorney suggested that a reduction of twelve years would be appropriate. Letter 2, ECF No. 1027.

with mentally ill offenders who have a high potential for disruptive behavior. In addition to his high work evaluations, he has on four occasions received positive entries from staff supervisors regarding his performance. These notes include references to a potential fight between two offenders that he de-escalated; assisting an offender in repairing a haircut that the offender had given himself; and comments on his professional, nonjudgmental work ethic. Additionally, on one occasion, he was called to assist [and successfully assisted] in calming an upset offender.

*Id.*

Under all of the circumstances discussed above, I am satisfied that the total sentence Scarpa will serve will still be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). I therefore grant the defendant's motion to the extent indicated above.

**SO ORDERED.**

Brooklyn, New York
January 4, 2016

*Edward R. Korman*
Edward R. Korman
United States District Judge