UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA         :         NOTICE OF MOTION

   -against-                         :         94-CR-1119 (ERK)

GREGORY SCARPA, JR.,             :

         Defendant.     :

- - - - - - - - - - - - - - -X

    PLEASE TAKE NOTICE that, upon the annexed declaration of Georgia J. Hinde, Esq., along with the accompanying attachments, the defendant GREGORY SCARPA, JR., respectfully moves, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), to reduce his present sentence and permit his compassionate release; to continue Ms. Hinde's earlier appointment pursuant to the Criminal Justice Act for the purpose of this proceeding, *nunc pro tunc* to May 1, 2020; and for such other and further relief as to the Court appears just and proper.

Dated:  New York, New York
       October 30, 2020

                          /s/
                  GEORGIA J. HINDE
                  Attorney for Defendant
                    GREGORY SCARPA, JR.
                  228 Park Avenue South
                  Suite 33276
                  New York, New York  10003
                  (212) 727-2717

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA      :      DECLARATION

    -against-                          :      94-CR-1119 (ERK)

GREGORY SCARPA, JR.,               :

              Defendant.   :

- - - - - - - - - - - - - - -X

    GEORGIA J. HINDE, an attorney duly admitted to practice in the Courts of New York State and in this Court, under penalties of perjury, here declares:

    1.  On behalf of the defendant Gregory Scarpa, Jr., I respectfully submit this declaration and accompanying documents in support of Mr. Scarpa's motion to reduce the remainder of his 482-month sentence and to order his compassionate release based on a combination of extraordinary and compelling circumstances relating to Mr. Scarpa's age, his progressively deteriorating health, his exceptional prison record and rehabilitation, and the recognized threats posed by the ongoing COVID-19 pandemic for such older individuals whose underlying medical conditions make them more vulnerable to the virulent effects of the disease while they are confined in prisons.

    2. The Court is authorized to grant compassionate release upon a defendant's application pursuant to the amended provisions of 18 U.S.C. § 3582(c)(1)(A), once a defendant has "fully exhausted

1

all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf", or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier". As discussed below, Mr. Scarpa's present application satisfies these requirements and, upon the Court's consideration of applicable factors in 18 U.S.C. § 3553(a), the Court should agree that compassionate release is warranted here.

### Background and Bases for Application

3.   Gregory Scarpa, Jr., is a 69 year old defendant who has been continuously imprisoned for the past 32 years, serving consecutive sentences for his convictions of racketeering conspiracies and underlying offenses that would not qualify as crimes of violence under present law because juries only found Mr. Scarpa guilty of inchoate offenses and not any corresponding substantive crime that had as an element the use or threatened use of force. After his first conviction in 1988, the district court imposed a statutory maximum sentence of twenty years, a term that expired (under the law as it existed prior to the Sentencing Reform Act) on October 18, 2000, after Mr. Scarpa had earned all of the old law's available industrial and good time credit that reduced his total sentence by approximately forty percent.

4.   Mr. Scarpa's present sentence of 482-months was imposed after Mr. Scarpa's conviction of conspiring to participate

in the same racketeering enterprise, during part of the same time period covered by the earlier racketeering conspiracy, but premised on different underlying offenses, many of which were alleged to have occurred before the Sentencing Reform Act took effect, and the most serious of which (alleged substantive murder predicate acts) the jury did not find proven beyond a reasonable doubt. As of now, Mr. Scarpa has already served twenty years of this sentence, and has earned an additional three years of good time credits, the most available under present law. Had Mr. Scarpa been able to earn the same amount of good time in the past twenty years as the law permitted during his first sentence for participation in a temporally and factually congruent racketeering conspiracy, he would as of now have completed about 83 percent of his sentence.

5. When Mr. Scarpa was last before this Court, he had recently undergone multiple surgeries and completed intensive courses of chemotherapy and radiation for Stage IV nasopharyngeal squamous cell cancer, a serious condition that the Court noted at the time afforded patients only a thirty-eight percent chance of surviving for five years. United States v. Scarpa, 155 F. Supp.3d 234, 236 (E.D.N.Y. 2016). We are glad to report that Mr. Scarpa has managed at this point to achieve a full five years of survival, but the after-effects of his surgeries and post-surgical adjuvant therapies have created serious difficulties that have made one of his most important activities of daily living, eating, a constant and sometimes life-threatening struggle.

3

6. Also, as this Court concluded based on the description of Mr. Scarpa's medical conditions in his 2015 supplemental presentence report (ECF Doc. No. 951), the overall state of Mr. Scarpa's health was then "generally poor", Scarpa, 155 F. Supp.3d at 246, and his affliction with other progressive diseases of aging in the past five years has only worsened his conditions. Medical records thus confirm that Mr. Scarpa is presently treated for hypertension, hypothyroidism, arthritis and joint pain, high cholesterol, psoriasis, and bladder and foot issues. He has also lost his ability to hear from one ear, and has undergone multiple hernia repairs in the past eight years, one of which resulted in a serious blood clot that required a second surgery. Also, in the past few years, Mr. Scarpa's cognition and memory have noticeably declined to the point that prison officials now prescribe medications designed to stabilize a neurological condition that is often a precursor to dementia or Alzheimer's disease.

7. Apart from the difficulties they present in their own right, many of these conditions, along with Mr. Scarpa's advanced age and his weakened immune system as a cancer survivor, are recognized by the Centers for Disease Control ("CDC") as making individuals more susceptible to the ongoing threats of either contracting, or having a more severe or fatal reaction to the COVID-19 virus that continues to threaten the entire United States, and is particularly devastating in congregate settings like nursing

4

homes and prisons, where residents are unable to maintain social distancing and adequate hygiene. At the beginning of this month, prison officials at Mr. Scarpa's Iowa institution had not reported that any inmate had contracted COVID-19, although four staff member were reportedly afflicted. Of course, staff who come and go from the prison always risk introducing the virus from outside its walls, particularly in Iowa, one of a minority of states that has refused to mandate the use of masks in public settings. That risk was unfortunately realized this month, when prison officials acknowledged that some 34 inmates had tested positive for or recovered from COVID-19. Like the rest of the country, COVID infections in the Iowa prison where Mr. Scarpa is incarcerated have thus surged and may unpredictably do so again. To avoid a serious infection, Mr. Scarpa will be better shielded from exposure to COVID-19 if released from prison to the home of his family and loved ones, an additional reason we urge this Court to consider in support of the present application.

8.  Finally, when assessing his eligibility for compassionate release, this Court should consider Mr. Scarpa's accomplishments during his three decades in prison that stand as substantial evidence of his complete rehabilitation. The Court is already familiar with one extraordinary accomplishment, when Mr. Scarpa obtained and disclosed information some fifteen years ago that allowed law enforcement officers to locate and safely remove

5

a cache of explosives hidden in a residential neighborhood by convicted terrorist Terry Nichols, a public safety achievement this Court rightly deemed worthy of a sentencing reduction, and that the Court of Appeals also acknowledged, even though it did not agree that Mr. Scarpa's efforts could be so rewarded without a government motion. *See* United States v. Scarpa, 861 F.3d 59, 71 (2d Cir. 2017) ("there is no question that Scarpa's information eventually provided substantial assistance in locating the cache of explosives components hidden in Nichols' former home"). This Court has also previously recognized the "persuasive evidence of Scarpa's post-offense rehabilitation", and his commendations for being an "extraordinarily model prisoner". United States v. Scarpa, 155 F. Supp.3d at 246-47; *id.* at 236 (recounting that Mr. Scarpa's prisoner "evaluations have exceeded expectations" and his adjustment "has been well above that of the typical maximum custody offender"); *see also* Fourth Addendum to Presentence Report dated July 15, 2015, at 8 (ECF Doc. No. 951, quoting state prison evaluation that also found Mr. Scarpa's behavior since his arrival at the Iowa facility to warrant "Tier 3 status", which affords prisoners "the highest level of privileges and fewest restrictions on movement" based on exceptional housing, work, and treatment evaluations that have resulted in a custody score of zero, "in the minimum custody range").

9.  When Mr. Scarpa returned to the Iowa state prison in 2015 after his extensive cancer treatment, his cherished position

as a prison mentor was no longer available, and his own diminished health limited the occupations he could pursue.  Nevertheless, he has since worked in the prison's carpentry unit, crafting furniture under the supervision of Iowa Prison Industries for sale to government agencies, school districts and non-profit groups.[1] He has also maintained his excellent behavior record and trusted Tier 3 status, as well as a remarkably positive world view and attitude, despite his years of incarceration and increasing medical difficulties and challenges.

10.   After the passage of the First Step Act at the end of 2018, I therefore advised Mr. Scarpa to submit an application to his warden for the compassionate release that I believe he well deserves.  We discuss below the course of Mr. Scarpa's efforts in this regard that have thoroughly satisfied the threshold qualification for his present application in this Court: the full exhaustion of administrative remedies. And while the Bureau of Prisons did not see fit to make any motion on Mr. Scarpa's behalf (as it rarely does,[2] even now, after Congress plainly indicated in

---

[1]   We annex in the accompanying Addendum (A.39-40) Mr. Scarpa's certificate for completion of another course training him to work in prison manufacturing, and a photograph showing an example of the furniture items created by the carpentry unit.

[2]   *See* Human Rights Watch & Families Against Mandatory Minimums, "The Answer is No: Too Little Compassionate Release in U.S. Federal Prisons," at 16-27, 34-39 (Nov. 2012), available at https://www.hrw.org/sites/default/files/reports/us1112ForUploadSm.pdf.

the relevant subtitle of the First Step Act, Sec. 603(b), 132 Stat. 5194, 5239, that the amended law is meant to "[i]ncreas[e] the use" of compassionate release), we hope this Court will agree, based on its independent assessment of § 3553(a) factors, that Mr. Scarpa should now be granted the compassionate release that Congress intended for aging prisoners whose medical conditions warrant that modification to their original sentences, who face unwarranted risks of severe illness or death during the ongoing COVID pandemic, and whose prison records confirm that they have achieved a degree of rehabilitation that well qualifies them for an earlier release.

### All Administrative Appeals Have Been Submitted and Denied

11. Mr. Scarpa initially applied for compassionate release by submitting his application to the Warden at the Iowa State Penitentiary on May 20, 2019 (Addendum at A.1-5). In that application, Mr. Scarpa described his inability to eat with the prison's general population after his treatments for throat cancer caused him frequently to choke or vomit while attempting to swallow (A.3). Because he is unable to eat most of the hot meals prepared by the prison, he has subsisted on a diet of cold cuts since 2015, and typically eats in his cell where he can take more time (A.3, A.42 (health services report specifying "Feed In x 12 mo")). Mr. Scarpa also reported that the prison medical staff has noted his cognitive decline and advised him that he could be in the early stages of dementia or Alzheimer's disease (A.3). Further, Mr.

Scarpa is treated for a number of other medical conditions, including hypothyroidism, a worsening hearing problem, five hernias in the past twelve years, psoriasis, high cholesterol, arthritis/joint pain, foot issues, and sciatic nerve issues (A.3-4). He has also developed cataracts that have not been addressed (A.4). Mr. Scarpa had none of these conditions when he was originally imprisoned at the age of 37 in 1988 (A.4).

12.   The Warden at the Iowa prison did not respond to Mr. Scarpa's application within 30 days, but did respond on July 5, 2019 (A.1-2).  In that response, the Warden merely advised that Mr. Scarpa's application was "[d]enied [at] this time" because Mr. Scarpa, as a federal prisoner serving his time in a state facility, had to "[s]tate your release questions [and] issues thru the Federal System Representative on their next visit" (A.1-2).

13. Because these federal visits do not frequently occur, Mr. Scarpa instead forwarded his application on July 30, 2019, to the Kansas City Residential Reentry Office of the Federal Bureau of Prisons, the office tasked with Mr. Scarpa's supervision while he remains incarcerated in a state facility (A.6). In a letter response dated August 13, 2019, the Acting Residential Reentry Manager, Gregg Fearday, RN, described Mr. Scarpa's application as a request to be considered for compassionate release/reduction in sentence ("RIS") based on his age, medical conditions, and completion of more than 50 percent of his sentence (A.6). Mr. Fearday responded that:

> Based on our review of your medical records, you do not meet the Bureau of Prisons elderly with medical conditions RIS criteria. You are independent and are not experiencing deteriorating mental or physical health that substantially diminishes your ability to function in a correctional environment. Your current facility is able to manage your medical needs at this time.

Mr. Fearday's response also advised Mr. Scarpa that he could appeal this decision by submitting his objections to the same Residential Reentry Office within 20 days (A.6).

    14. On August 28, 2019, Mr. Scarpa promptly prepared and submitted an appeal from the BOP's denial of his application for compassionate release, reminding the office that his application is also based on the ground that he is over 65 years of age and has served more than 50 percent of his sentence (A.7-26). He advised the BOP that, much as he would like to be independent, he no longer could claim that ability: he cannot eat with the general population, but needs someone with him at mealtimes to help him when he chokes and sometimes comes close to losing consciousness (A.8). He explained that his choking was the result of the hole left in his throat after surgeons removed a golf-ball sized tumor, and that this cavity often allowed food to go down his windpipe instead of his esophagus (A.8). Further, the prison has not addressed this serious choking problem beyond substituting cold cuts, bread and pudding for the prison's usual meals, and Mr. Scarpa still chokes on those items as well (A.9). He tries to maintain his weight with ice cream and cookies, knowing that those

are not a healthy alternative (A.9). The prison supplies packets of Carnation Nutritional Supplement that he mixes with milk, but that does not help him maintain his weight either (A.10).

15.  In addition to his cancer-related difficulties, Mr. Scarpa also described his cognitive impairment that is getting progressively more noticeable: he can no longer remember telephone numbers and appointments; nor follow conversations or keep his own train of thought while speaking, nor read a book or remember a movie he had just watched; and he injured himself at work, seriously cutting two fingers after forgetting to shut off a machine before he cleaned it (A.8). Further, his physical health is deteriorating in other ways as well: he has lost a full range of motion in his neck due to nerve damage from his cancer surgeries; and the fact that one of his carotid arteries had to be removed during his cancer surgeries makes him worry that an injury to his only remaining carotid artery could prove fatal (A.9).

16.  Mr. Scarpa advised that the prison medical unit has prescribed a number of medications for his conditions (Gabapentin for nerve damage, Pilocarpine to help develop saliva due to radiation damage to his salivary glands, Biotene products for his dry mouth, Atomoxetine for concentration, Mirtazapene for depression, Levothyroxine for hypothyroidism, Simvastatin for high cholesterol, Clobetasol for psoriasis, Omeprazole for digestive upsets, and aspirin to help thin his blood), but has not addressed

his choking problem (A.9-10, A.44-56). Mr. Scarpa therefore depends on the help of other prisoners who also wrote letters to the BOP to confirm Mr. Scarpa's conditions and lack of independence (A.11-14).

17. Mr. Scarpa's cell mate, Patrick Thompson, described how he has to wake Mr. Scarpa when it is time for his medications or time to go to work; how Mr. Scarpa choked on almost every other bite of the meals prepared by the prison; how Mr. Scarpa lacked the physical strength to make his bed or clean the cell; and how Mr. Scarpa increasingly appears to have mental troubles (A.11). Nevertheless, Mr. Scarpa always made an effort to help his cell mate with advice on how best to adjust to his situation, and Mr. Thompson was happy to help Mr. Scarpa in return, "out of kindness and because it's the right thing" (A.11).

18. A second inmate, Denis Gaily, wrote that he had known Mr. Scarpa for the past seven years, and that he had been "very fit, strong and active with a big appetite" before his cancer, but he is unable to eat the prison meals since his surgeries and has had choking problems more often than not, some of which "were very scary" (A.12). Mr. Gaily noted that, while Mr. Scarpa used to spend a lot of time on treadmills and elliptical machines, he never uses the exercise equipment anymore, and appears to have lost interest or become depressed (A.12). Mr. Gaily also used to tease Mr. Scarpa about his poor memory, "not realizing until last year that it is bad" and that "he is declining faster than normal and he needs

help" – an observation that Mr. Gaily has an experiential basis to make because his father also suffered from dementia and he is familiar with its symptoms (A.12). As Mr. Gaily confirmed, Mr. Scarpa's memory problems led to his injuring himself at work, and he often forgets what day it is, when to go to chapel or appointments, and he mixes up news events or movie plots he tries to recite (A.12).

19. A third inmate, Gary Kirchner, has also known Mr. Scarpa for several years and presently works with him in the prison industries unit building items with wood (A.13). Mr. Kirchner also confirmed that Mr. Scarpa suffered a serious injury that almost cost him a finger when he was working on a boring machine at work, that Mr. Scarpa's focus and memory have declined in the past two years, and that overall, he appears to be "deteriorating quickly" (A.13). Mr. Kirchner urged the BOP to consider all of Mr. Scarpa's conditions and to allow him to spend "his last stage of life" with his family, averring that Mr. Scarpa is "struggling in prison" (A.13).

20. Last, Eric Thompson wrote of his friendship with Mr. Scarpa over the years, that he has seen him in recent years forget many things that others would not, and that his "memory is really bad and getting worse", something that it is "easy for a friend to notice" (A.14). As Mr. Scarpa's memory declines, Mr. Thompson is concerned that he will have to depend on his friends to care for

him, and he urged the BOP to allow his release so that his family can care for him instead (A.14). Mr. Thompson also confirmed that Mr. Scarpa is unable to eat with the general population since his cancer treatments (A.14).

21. Mr. Scarpa's appeal also included letters from family members whose accounts similarly showed that their father, brother and cousin is no longer able to independently function in prison due to his deteriorating physical and mental conditions (A.15-23). A letter from his son and daughter-in-law, Gregory and Danielle Scarpa, contrasted their visits with Mr. Scarpa in 2015 and 2019 (A.16). As they explained, after visiting with Mr. Scarpa in August of 2019, they agreed he had "looked better in 2015, even though he had just had major surgery on his throat and was undergoing chemotherapy and radiation at the time" (A.16). They were concerned that his cancer could return and he would not get back to the hospital soon enough to detect it, or would have to undergo chemotherapy and radiation again (A.16).

22. Mr. Scarpa's son and daughter-in-law also noticed how their father's memory had declined in the past four years: he forgot parts of stories he had told many times before, he became repetitive with questions that his family had just answered, his comprehension was poor, and he always forgot to remove the prepaid visitor's card from the vending machines during their visits (A.16-17). They noticed, too, that Mr. Scarpa's hearing is poor, both

14

during telephone conversations and in-person visits, leaving him vulnerable to injury if someone attempted to assault him from behind (A.17).

23. Their greatest concern was, however, Mr. Scarpa's inability to eat without choking, and the many choking incidents he has experienced since his surgeries, two of which required someone's intervention (A.17).[3] The children worried also that his inability to eat has left him thin and frail, and made it seem he had aged ten years when only four had passed (A.17). They urged the BOP to grant his application and allow him to return home to family who will take full responsibility for his care (A.18).

24. Mr. Scarpa's youngest daughter, Maria, also asked that the BOP reconsider its decision, citing first her father's declining memory and the fact that he could not recall his grandson, Mikey, even though his daughter and grandson visited with him every year for the past five years (A.19-20). His daughter also expressed her concerns over Mr. Scarpa's work-related injury when he forgot what he was doing and cut his hand, and about his inability to eat without choking (A.20). She joined her brother and sister-in-law in asking that their father be released so he could get the care he needs from his family (A.21).

---

[3]    The letter from Mr. Scarpa's children described that intervention as "CPR", but Mr. Scarpa asked me to clarify that he has not yet required full blown CPR for his choking, although he has needed the assistance of the Heimlich maneuver on multiple occasions in order to dislodge food from his windpipe.

25.   Mr. Scarpa's sister, Deborah Colosi, also wrote about her visit with her brother in August 2019, and noted how changed he appeared since her last visit three years earlier (A.22). She observed that he had lost weight because of his inability to swallow many foods, that he had become forgetful and repeated things often, and that he had lost his hearing on one side (A.22). She also urged the BOP to reconsider and allow Mr. Scarpa to return home where his family could look after him (A.23).

26. Mr. Scarpa's cousin, Linda Cordero, provided a similar account from her visit in July 2019, noting his difficulties swallowing, his substantial weight loss that left him "a shadow of what he once was", and his apparent forgetfulness and declining comprehension (A.24). Ms. Cordero noted that her cousin kept a positive attitude about everything, but she nevertheless worried that, unless he could put on some weight again, he would not be able to survive another round of cancer treatments in the event his cancer returned (A.24).

27. Mr. Scarpa's appeal also included information about his proposed release plan: that he would live in Florida with his sister, Ms. Colosi, who is both "emotionally and spiritually supportive" and will take care of his basic living expenses; he would apply for Medicare and supplemental health insurance to cover his medical needs; and he would maintain employment to the extent his health permitted it, working for his sister and brother-in-law

16

in Florida as a billing clerk for their business (Ocean Feed and Wayside Trucking), a position that would allow him to work from home issuing invoices to customers and maintaining electronic inventory records (A.25-26).

28.   Mr. Scarpa submitted his appeal to the Iowa prison authorities on August 28, 2019, for mailing to the BOP's supervising office (A.7). In no time at all, the same Acting Residential Reentry Manager who had signed the original BOP denial issued a second denial on the same day that Mr. Scarpa's appeal arrived at that office (A.27). Ignoring the first hand accounts of Mr. Scarpa, his family, and his fellow inmates, the BOP simply repeated that "[a] review of your medical record finds you are independent and are not experiencing deteriorating mental or physical health that substantially diminishes your ability to function in a correctional environment", and opined that "your current facility is able to manage your medical needs at this time" (A.27). This response dated September 4, 2019, also invited Mr. Scarpa to submit any further appeal within 20 days to the "Residential Reentry Sector Administator", located at the same address and within the same suite where he forwarded his first two applications (A.27). Mr. Scarpa promptly did so on September 17, 2019, forwarding copies of all of his submissions from the most recent appeal, and asking the BOP to consider all of his medical issues together because, when combined, they show why he is in fact "unable to function normally in a prison environment" (A.28).

17

29.   It took a lot longer for the "Sector Administrator" to respond to Mr. Scarpa's appeal, but the substance of the response was just as dismissive and empty. Thus, on February 11, 2020, the BOP summarily informed Mr. Scarpa that his appeal and documents had been reviewed and, "[b]ased on this review, we concur with the manner in which the Acting Residential Reentry Manager addressed your concerns" (A.29).  The BOP then invited Mr. Scarpa to submit any appeal to the BOP's Office of General Counsel within 30 days (A.29).

30.   After the BOP's first two denials of Mr. Scarpa's application and request for reconsideration, he asked his local Iowa prison custodians about medical information the BOP claimed to have considered when it concluded that he maintained an ability to function independently in prison despite his problems (A.30).  With respect to Mr. Scarpa's medical records, the Iowa prison officials responded on September 24, 2019, that no medical records had been requested by or sent to the BOP recently, although they recalled sending records "several years ago" (A.30). As for any reports about Mr. Scarpa's ability to live independently in prison, Mr. Scarpa asked his case manager whether he had provided any relevant information or records to the BOP, and his case manager responded that he had briefly discussed Mr. Scarpa's Tier 3 status and what it signifies with the BOP's acting Residential Reentry Manager (the BOP official who twice denied Mr. Scarpa's application), but he recalled no other conversation with this BOP representative (A.30).

31. Based on this investigation, Mr. Scarpa submitted his final appeal to the BOP in March 2020 (A.31-34).[4] In this appeal, Mr. Scarpa objected to the BOP's conclusions about his medical status and ability to function independently when the BOP had not obtained any medical records from the Iowa prison or contacted any medical personnel at the prison (A.32). He also questioned the basis for the BOP's conclusion that he could function independently when the evaluating BOP official only contacted one member of the Iowa prison staff, petitioner's case manager, who has no authority to review an inmate's medical records, and who does not see how well or poorly Mr. Scarpa manages his medical conditions since the case manager only makes his rounds to Mr. Scarpa's unit once a day, usually when Mr. Scarpa is not present (A.31).

32. Based on the BOP's omissions, Mr. Scarpa urged the Central Office to reconsider his combined and debilitating medical conditions after reviewing his actual medical records, and to grant compassionate release based on his age (over 65), his service of more than 50% of his sentence, and his serious medical conditions, including his inability to eat without choking or vomiting, his nerve damage after his cancer surgeries, his cognitive decline, and the numerous other conditions that are progressively worsening as he ages (hypothyroidism, hernias, psoriasis, high cholesterol,

_____

[4] Mr. Scarpa resubmitted this appeal again on April 13, 2020, after the BOP Central Office returned the original appeal to him because he had forgotten to sign and date the application form and to include copies of prior administrative remedy appeals (A.34).

arthritis/joint pain, foot and sciatic nerve issues, and an enlarged prostate) (A.32). As he fairly summarized his situation, "[d]eath is creeping up on me" and all of his combined medical conditions "are affecting my ability to function as a normal prisoner", a fact the letters from his family and fellow inmates also confirmed (A.32). Under the circumstances, "the only missing ingredient required to approve the appeal is compassion" (A.32).

33. At the same time that Mr. Scarpa submitted this appeal, he also applied for home confinement under the recent CARES Act for Elderly Offenders Due to the COVID-19 pandemic (A.35-37). In support of this application, Mr. Scarpa again showed that his age and conditions should qualify him for home confinement: he is well over 60 years of age, he has a variety of medical conditions that make him more susceptible to the COVID-19 virus, including a weakened immune system and low white blood count following his cancer surgeries and treatments with chemotherapy and radiation; high blood pressure; a recent melanoma that had not been evaluated because of the travel restrictions during the COVID crisis; and all of his combined and progressively worsening physical and cognitive conditions of aging that also support his application for compassionate release (A.35-36).[5]

---

[5]    Mr. Scarpa also recently asked the BOP to reconsider this part of his application in light of the outbreak of positive COVID-19 cases at his Iowa prison (A.70-71), as noted below.

34. Despite his qualifications for either compassionate release or release to home confinement, and the BOP's insufficient inquiry into Mr. Scarpa's conditions and management of his activities of daily living before rejecting his applications, the Central Office again summarily denied Mr. Scarpa's appeal in a response dated July 6, 2020 (A.38). The response first determined in error that "the Warden properly found you do not meet the criteria for a RIS [reduction in sentence] on the basis of available information" (A.38). In Mr. Scarpa's case, however, the only determination his Warden made was that he had to submit his application to the BOP (A.1), so the Central Office utterly misconstrued the history of his application.

35. Next, more information was "available" than the Central Office considered, just as more information could have been considered during the earlier BOP reviews of Mr. Scarpa's application had anyone bothered to contact medical staff at the Iowa prison or anyone who had a first-hand basis to evaluate Mr. Scarpa's present difficulties functioning in prison. Instead, the Central Office response erroneously reduced Mr. Scarpa's actual age from 69 to 65 and asserted that "records show that you have been clear of throat and neck cancer for three years", as opposed to the five-year period that has passed since he underwent chemotherapy and radiation (A.38). These errors suggest that, assuming it considered any medical records at all, the BOP was at best not using current medical records as the basis for its evaluation.

21

36.   This same conclusion flows from the conditions the BOP itemized in its response: it listed only Mr. Scarpa's history of throat and neck cancer, hyperlipidemia, "hyperthyroidism" (when his actual condition is hypothyroidism), and lower back pain, and swept all other unspecified conditions aside under the rubric that each was "managed and currently stable" and did not interfere with his ability to "independently perform your activities of daily living" (A.38). The BOP gave no express consideration whatsoever to Mr. Scarpa's inability to eat without choking,[6] the unhealthy modifications of his diet that neither manage nor stabilize this serious condition, nor his developing cognitive impairment that has already led to a workplace injury and could well result in further problems in a prison setting.

37.   In light of Mr. Scarpa's complete exhaustion of his administrative appeals, as well as the passage of well more than 30 days since he originally applied for compassionate release more than a year ago, there should be no issue that Mr. Scarpa's request for compassionate release is now fully amenable to this Court's review and relief under § 3582(b)(1)(A), as discussed below.

### What Available Medical Records Actually Show

38.   The BOP plainly gave inadequate or flawed consideration to Mr. Scarpa's medical conditions, but nowhere did

---

[6]   This condition, dysphagia, has repeatedly appeared in Mr. Scarpa's medical records since he returned to prison after his cancer surgery and adjuvant therapies in 2015.  Copies of relevant medical records will be filed under seal with this submission.

it suggest that he is not suffering from the conditions he identified and described.  We present in a separate sealed exhibit relevant medical records Mr. Scarpa was able to obtain from Iowa prison officials and discuss them briefly here. We also annex the prison's list of Mr. Scarpa's work restrictions (A.41-42) and prescribed medications used to treat Mr. Scarpa's various conditions (A.43-46), along with descriptions of the conditions for which some of those medications are prescribed (A.47-56). These documents all confirm that Mr. Scarpa is in fact suffering from the conditions that are the main basis for his request for compassionate release.  If the Court requires additional records, we respectfully request that the Court again order the preparation of a supplemental presentence report discussing Mr. Scarpa's current medical conditions.

39. With respect to Mr. Scarpa's work and living restrictions, one recent health services report confirms some of the limitations created by his present medical conditions (A.41-42). The report thus indicates that Mr. Scarpa is presently restricted to the lower bunk and ground floor, that he is no longer permitted to participate in team sports and may not lift weights in excess of 50 pounds, that he must use various types of medical aids, including lumbar support, an inguinal truss, a knee sleeve, gel inserts, and an extra pillow; that he is confined to his cell for meals ("Feed In x 12 mo"); and that he has urinary urgency and often needs to use the bathroom quickly (A.41).

40.  Mr. Scarpa is also presently prescribed a number of medications for his chronic conditions (A.43-46): Metoprolol for hypertension (A.51-54), Donepezil for dementia (A.47-48), Mirtazapine for anxiety (A.49-50), Tamsulosin for a bladder condition, Levothyroxine for hypothyroidism, Simvastatin for hyperlipidemia, Clobetasol for psoriasis, Gabapentin for post-surgery neck pain, Pilocarpine and Biotene for dry mouth, Ibuprofen for pain, Atomoxedine for concentration/focus (A.55-56), and various nutritional supplements and digestive aids.

41. Medical records from 2015-2019 (submitted under seal) also show that, since he returned to prison in 2015, Mr. Scarpa has repeatedly reported his ongoing difficulties with swallowing and choking when he eats (dysphagia), a side effect that resulted after his salivary glands were damaged during his cancer surgeries and therapies. Prison officials therefore have allowed him to take most, and later all meals in his cell, in order to afford the additional time he requires to get through his meals. Nevertheless, by 2016, Mr. Scarpa was diagnosed as suffering from malnutrition, a condition that likely resulted when the prison provided incorrect foods to Mr. Scarpa and he was unable to consume them. His dysphagia continues to the present day, and prison authorities acknowledged in 2019 that it was "getting worse". Nevertheless, the prison has not responded to Mr. Scarpa's requests that someone check on him during meal times in his cell in order to render assistance when he has another choking episode (A.57).

42.  In addition, after an examination in April 2019, prison authorities concluded that Mr. Scarpa's "BP numbers are bad" based on readings in 2018 and 2019 (*see* sealed medical records). Medical records also reported in 2019 that Mr. Scarpa suffered five hernias in the past 12 years, and that surgery to repair one of those hernias led to a blood clot that required additional surgery.

43.  Mr. Scarpa has also shown marked cognitive decline in the past two years.  While the psychiatric department will not provide records without a court order, I spoke to one of the staff psychologists in that department (Psychologist Joy Kuper) who advised that Mr. Scarpa's scores on mental status examinations he has taken in the past two years have dropped from 29 (out of a possible 30) on January 30, 2018, to 22 in April 2020. Tests taken in between showed fluctuating scores (20 in April 2018, 21 in June 2018, 25 in January 2019, 21 in April 2019, and 23 in October 2019), but his score has not approached the high level achieved in January 2018 since that time. Mr. Scarpa was supposed to have undergone another evaluation this month, but conditions at the prison created by the pandemic have required that it be postponed.

44. The particular test used by the prison, the St. Louis University Mental Status test (SLUMS), classifies scores of 27-30 as "normal", scores of 21-26 as indicative of a "mild neurocognitive disorder", and scores of 0-20 as indicative of "dementia". Studies agree that individuals with mild cognitive disorders of the sort Mr. Scarpa's test scores suggest, may often

progress to dementia or Alzheimer's disease, conditions for which one of Mr. Scarpa's present medications (Donepizel) has been prescribed (A.48). *See, e.g.,* www.mayoclinic.org/diseases-conditions/mild-cognitive-impairment/symptoms-causes (reporting that those with mild cognitive impairment have some of the "same types of brain changes seen in Alzheimer's disease or other forms of dementia", and that those with mild cognitive impairment have "a significantly increased risk . . . of developing dementia").

45. One final but substantial medical issue that is not reflected in any medical record, but is a reality we all continue to face, is the ongoing threat posed by COVID-19 in all congregate settings, including prisons. New York has thankfully overcome its epicenter status for the present, but the COVID virus has worked its way into the center of our country,[7] with cases reported among both staff and inmates in Iowa state prisons. *See* https://doc.iowa.gov/COVID19.

46. At the beginning of October, the facility where Mr. Scarpa is incarcerated (ISP) reported no inmate infections, but ISP had at that time four staff infections and 21 recovered staff members. By October 5, 2020, three inmates tested positive for COVID-19, and the prison began testing and adopted measures

---

[7] A nationwide map tracking COVID trends by county shows significant numbers of new COVID cases in a cluster of midwestern states, including Iowa. *See* www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

restricting movement to curtail the spread (A.58-59).[8] On October 9, 2020, the prison's Warden thanked the inmate population for its cooperation with testing and restrictions, and acknowledged that "around two dozen inmates" had at that point tested positive for COVID-19 (A.70). Five days later, on October 14, 2020, testing had confirmed that 27 inmates were infected and 5 were considered "recovered" (A.60).[9] Six days later, on October 20, 2020, the ISP reported that 15 inmates remained infected, 19 had "recovered", and three staff members were infected (A.61). As of October 28, 2020, the Iowa prison website reported that one inmate remains infected, 33 have "recovered", and three staff members remain infected.

47. This recent COVID outbreak created a substantial risk to Mr. Scarpa, and another will do the same, given his age, his poorly controlled hypertension, and his weakened immune system as a cancer survivor, all of which make him more vulnerable to a severe reaction if he contracts the COVID-19 virus according to the

---

[8] Those restrictions kept inmates in a locked-down status from October 2-16, 2020, and permitted showers no more than three times per week. Presently, inmates are restricted to their cells for all but 2 hours each day, but during that time period, they are again permitted daily showers and telephone calls, while still restricted to their respective "pods" and thus unable to work or undergo non-emergency medical tests or treatment. Mr. Scarpa has been tested twice this month for COVID-19, and both tests were negative.

[9] Studies have recently shown that, even for those who recover from initial COVID symptoms, the cellular level damage from the virus may linger and effect not only the lungs, but the heart and brain, making it important to avoid infection whenever possible. *See* www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351.

most recent guidance from the Centers for Disease Controls (CDC).[10] Many courts have, moreover, recognized such age- and medically-related vulnerability as an "extraordinary and compelling" premise warranting compassionate release in the past seven months. We therefore ask this Court to consider this defendant's vulnerability in these disturbing times as further support for a reduction in Mr. Scarpa's remaining sentence.

### The Defendant's Release Plan

48.   In addition to his submissions to the BOP,[11] Mr. Scarpa has written to the Court about his medical conditions, all he has learned in his past 32 years in prison, and how he hopes to spend his remaining years if the Court will permit his compassionate release from prison (A.62-65). His letter speaks of a man who understands the seriousness of his past wrongdoing and his commitment to spending the rest of his life in lawful pursuits, just as he has tried to make amends during his incarceration. He enjoys the ongoing support of his sister, cousin, and grown children, and hopes to have time to spend with his five grandchildren as well. He will be able to work from home for his sister's company and, perhaps most remarkable given his present

---

[10]   See www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

[11]   On October 14, 2020, in light of the COVID outbreak at his prison, Mr. Scarpa submitted a renewed request for home confinement to the BOP (A.71), but he has not yet received any response.

situation, he has met a woman, Ms. Deanna Bennett, who has regularly visited him for the past three years, and whom he hopes to marry one day.

49. Ms. Bennett has also written to the Court (A.66-69), describing how she met Mr. Scarpa in June 2017, after writing to him to send encouragement on his efforts to recover from his health difficulties. Until the COVID crisis prevented prison visits, Ms. Bennett drove from Ohio to Iowa to visit with Mr. Scarpa on many weekends since then. There, she heard from other inmates and prison staff what a "great guy" he is, how he has helped younger inmates adjust to their prison situation and learn how to conduct themselves, and "grew to see the loving person that I believe Greg is today". Mr. Scarpa has shared many stories about his past with Ms. Bennett, and she believes he takes full responsibility for his wrongdoing and is committed to avoiding misconduct in his future.

50. For her part, Ms. Bennett "plan[s] to be at Greg's side and help him learn how to live in a totally changed society, and to do whatever I can to help his health improve." Ms. Bennett's letter also recounts her own observations about Mr. Scarpa's declining physical and cognitive health, and the difficulties prison life poses for him on that account. Finally, Ms. Bennett has assured this Court that, if he is granted compassionate release, "I will be there to help him and make sure that he abides by every rule, and complies with all conditions of

home detention or supervision", and will "be his backup to make sure he stays on the right path for the rest of his life".

51.   Mr. Scarpa is fortunate to have so many supportive family members, as well as this new and positive relationship in his life.  All stand ready to provide Mr. Scarpa with a place to live, work that he can manage, and companionship and care upon his release. He has also spent a staggering 32 years of his life making the best of a difficult prison setting, learning everything he can about how to live a better life and to help others, and even making an extraordinary contribution to public safety when he obtained and disclosed information that allowed the discovery and safe removal of hidden explosives in 2005.

52. Five years ago, this Court agreed that Mr. Scarpa deserved a reduced sentence for his substantial public service alone.  Since then, with the passage of the First Step Act of 2018, the law has evolved to empower this Court with far greater discretion to consider Mr. Scarpa's advanced age, his declining physical and cognitive health, the substantial amount of time he has already spent in prison, the threats to his health posed by the COVID-19 pandemic for all with preexisting vulnerabilities, and a record showing "persuasive evidence of his post-offense rehabilitation" as grounds for his compassionate release or his release to a period of home detention and supervision.  This relief is warranted because of the particular combination of extraordinary and compelling reasons that are present in this defendant's case,

and because it is consistent with sentencing factors in 18 U.S.C. § 3553(a) and Congressional intent when enacting the First Step Act in order to expand the availability of compassionate release. We discuss relevant authorities below, and urge the Court to exercise the compassion the law allows by permitting Mr. Scarpa's immediate release to his family's care, on whatever conditions the Court deems appropriate.

## ARGUMENT

### Compassionate Release Should Be Granted

Gregory Scarpa, Jr., is a 69-year old man in poor health, who has spent the past 32 years in prison for offenses, mostly inchoate, that juries found he had committed in connection with a single racketeering conspiracy. His disciplinary record throughout his imprisonment has been excellent, and he has spent his time in the commendable pursuits of available education, employment, and mentoring of younger inmates in a manner that his most recent prison has recognized and applauded. He also obtained and supplied the government with information that allowed the discovery and removal of explosives from a residential neighborhood in 2005, conduct for which this Court previously awarded him a reduction to the 40 year sentence he continues to serve, a sentence this Court aptly described as "staggering" (Doc. No. 43, 8/5/10 Tr. 12, 45).

In addition to these exceptional achievements, Mr. Scarpa continues to suffer from debilitating side effects of the life-

saving surgeries and adjuvant therapies he underwent in 2015 for a severe and advanced form of cancer, making it more difficult for him to manage his activities of daily living, particularly eating. He has also begun to exhibit cognitive decline according to tests administered in the past two years and the observations of those who know him. Making matters worse, Mr. Scarpa's prison has this month experienced its first wave of the dreaded COVID pandemic, with 34 positive cases among inmates and the entire facility undergoing the resulting lock downs that foreclose movement and visiting, and create generally harsher conditions of confinement as prison officials attempt to curb the spread of the virus.

Any of these circumstances could be considered an extraordinary and compelling ground for compassionate release, and the combination of all of them certainly meets that mark. The authorizing statute, 18 U.S.C. § 3582(c)(1)(A), is straightforward enough, explaining that a court may, "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, . . . reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set

forth in section 3553(a) to the extent they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction".

Last month, the Court of Appeals gave district courts helpful guidance on how to determine whether extraordinary and compelling reasons exist for a sentencing reduction. In <u>United States v. Brooker</u>, No. 19-3218, 2020 U.S. App. LEXIS 30605 (2d Cir. Sept. 25, 2020), the Court acknowledged the history of this authority, going back almost forty years to the time of the Comprehensive Crime Control Act of 1984, when Congress first provided this "mechanism for lenity", but restricted any judicial consideration of the standards for relief by requiring an initiating motion from the Director of the Bureau of Prisons, an "absolute gatekeeping authority" that the BOP exercised "sparingly, to say the least". *Id.* at *5-7. Years later, in 2006, the Sentencing Commission issued U.S.S.G. Policy Statement § 1B.13 to satisfy the statutory requirement in 28 U.S.C. § 994(n) that this agency "describe what should be considered extraordinary and compelling reasons for sentencing reduction, including the criteria to be applied and a list of specific examples". *Id.* at *7-8. The Sentencing Commission identified an inmate's terminal illness, his significant decline relating to the aging process that would limit his ability to care for himself in prison, the death or incapacitation of a defendant's family member caring for his minor children, or any other

33

extraordinary or compelling reason "other than, or in combination with" these specified grounds. *Id.* at *8-9. The policy statement also permitted consideration of a defendant's rehabilitation, but excluded "rehabilitation, by itself" as sufficiently extraordinary and compelling for purposes of compassionate release. Application Note 3 to U.S.S.G. Policy Statement § 1B1.13.

None of the Sentencing Commission's policy statements did much to move the BOP off its minimalist approach to filing compassionate release motions on behalf of inmates, even when a later amendment expressly "encourage[d]" the BOP "to file such a motion if a defendant met any of the circumstances set forth in Application Note 1." Application Note 4 to U.S.S.G. Policy Statement § 1B1.13. For example, Mr. Scarpa's circumstances easily satisfied the Sentencing Commission's definitions of when "extraordinary and compelling circumstances exist" since he is "(I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, [and] (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Application Note 1(A)(ii) to U.S.S.G. § 1B1.13 ("Medical Condition of the Defendant"). In addition, Mr. Scarpa's circumstances qualify as "extraordinary and compelling" because of the "Age of the

Defendant", insofar as Mr. Scarpa "(i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his . . . term of imprisonment, whichever is less." Application Note 1(B) to U.S.S.G. Policy Statement § 1B1.13.

Yet the BOP made no motion on Mr. Scarpa's behalf, and this Court had no resulting opportunity to occupy its "unique position to determine whether circumstances warrant" a sentencing reduction after considering § 3553(a) factors. Application Note 4 to U.S.S.G. § 1B1.13.  With the passage of the First Step Act in 2018, however, defendants can now ask their sentencing courts to assume their unique position once more, by moving on their own behalf for compassionate release after sending an initial application to their warden and either waiting 30 days for a response or exhausting available administrative remedies.

Mr. Scarpa has fully exhausted his request for compassionate release under both alternatives. When defendants present such exhausted requests for compassionate release to their sentencing courts under the First Step Act, courts previously followed § 1B1.13's guidance, even though that policy statement, unamended due to the lack of a sufficient number of Sentencing Commission members over the past few years, is "at least partly anachronistic because it has not yet been updated to reflect" that motions may be

made by the defendant as well as by "the Director of the Bureau of Prisons". <u>United States v. Ebbers</u>, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020). As the Court of Appeals has most recently clarified in <u>Brooker</u>, 2020 U.S. App. Lexis 30605, at *13-14, *17-18, however, a sentencing court's broad discretion and independent determination of what circumstances are "extraordinary and compelling" enough to support compassionate release are not confined by § 1B1.13 when a motion is, as here, filed by a defendant instead of the Bureau of Prisons.

In <u>Brooker</u>'s words, after the First Step Act, "[w]hen the BOP fails to act, Congress has made the courts the decision maker as to compassionate release". *Id.* at *18. The First Step Act thereby "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release" without any limit on its discretion drawn from a "clearly outdated" policy statement that itself acknowledged how courts are "in a unique position to determine whether the circumstances warrant a reduction". *Id.* at *20 (quoting Application Note 4 to § 1B1.13).

<u>Brooker</u> recognized that the kinds of circumstances courts may find extraordinary and compelling are no less broad than the "very wide latitude" of considerations district courts are accustomed to addressing "in all sentencing matters". *Id.* at *22 (quoting <u>United States v. Cavera</u>, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*)). In

36

_Brooker_, for example, the Court of Appeals did not foreclose the district court's consideration of the defendant's young age at the time of his offense conduct, the sentencing court's own statements at the time of the original sentencing about the injustice of the mandatory minimum sentence it had been obliged to impose, the effects of the COVID-19 pandemic on incarcerated individuals, and the defendant's "apparently extensive" rehabilitation, a consideration courts may weigh as long as a sentencing reduction is not based on rehabilitation "alone", as prohibited by 28 U.S.C. § 994(t).

Since _Brooker_ clarified the breadth of a district court's discretion, a number of courts have granted § 3582 motions based on a variety of extraordinary and compelling reasons. Most urgently in these troubling times, courts continue to order the release of inmates whose preexisting medical conditions make them more vulnerable to contracting a COVID infection in prison, or to the more severe effects of the disease. _See, e.g.,_ United States v. De La Cruz, 2020 U.S. Dist. LEXIS 195944 at *20-21 (D. Conn. Oct. 22, 2020) (granting compassionate release to defendant who had served two-thirds of her sentence, based on COVID risks to hypertensive and obese individuals, and on defendant's "outstanding record while in custody"); United States v. Wooten, 2020 U.S. Dist. LEXIS 191940, at *20-27 (D. Conn. Oct. 16, 2020) (granting compassionate release to defendant based on changed family circumstances, risks

of COVID infection in prison, excellent prison record, and family supported release plan); United States v. Fernandez, 2020 U.S. Dist. LEXIS 190157, at *2, *9-10 (S.D.N.Y. Oct. 14, 2020) (granting compassionate release to 51 year old hypertensive and diabetic defendant who had served half of 135-month sentence, based on COVID risks and defendant's good record in prison); United States v. Lizardi, 2020 U.S. Dist. LEXIS 188147, at *8-10 (S.D.N.Y. Oct. 9, 2020)(granting compassionate release when conditions of defendant's confinement during COVID pandemic "more arduous" than could have been anticipated at time of sentencing: "A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison"); United States v. Fisher, 2020 U.S. Dist. LEXIS 188065, at *1-2, *7-8, *12-14 (S.D.N.Y. Oct. 9, 2020)(granting compassionate release to 73 year old defendant serving life without parole, based on 38 years defendant had already served, age and medical conditions (hypertension, hyperlipidemia) that increase risks from COVID pandemic, and defendant's "exceptional rehabilitation efforts"); United States v. Jones, 2020 U.S. Dist. LEXIS 186570, at *13-17 (D. Conn. Oct. 8, 2020) (granting compassionate released after defendant served less than two years of 63 month sentence for bank robbery, based on COVID pandemic health risks to defendant and his comprehensive release plan).

38

A defendant's advanced age is another significant circumstance that may call for compassionate release, not only for COVID avoidance reasons, but because of the physical and/or mental deterioration that too often accompanies the aging process. This Court has thus ordered a defendant's compassionate release after he served almost 30 years in prison, based in part on the fact that he would not have been subject to a mandatory life sentence under current law, and also because of the "obvious" COVID risks posed to a man of 88 years. United States v. DiGirolamo, 2020 U.S. Dist. LEXIS 196737, at *1-2 (E.D.N.Y. Oct. 22, 2020). As the Court and the probation office agreed, given defendant's "age and the number of years he has served, 'compassionate release seems only right'", and there is "no reason why [the defendant] should die in prison". *Id.*

Other courts in earlier decisions have shown similar compassion to older defendants who have served significant terms of imprisonment under difficult circumstances. *See* United States v. Hansen, 2020 U.S. Dist. Lexis 61946, at *1, *11, *22-23, *26-28 (E.D.N.Y. Apr. 8, 2020) (granting compassionate release to 72 year old defendant who had served more than 10 years of a 20 year sentence, whose medical records "overwhelmingly depict a body and mind besieged with mounting, serious afflictions" (including possible recurrence of previously treated cancer, dementia, difficulty swallowing, hypertension, high blood pressure, and other

ailments requiring a dozen prescriptions, all of which are circumstances that impair an inmate's ability to function independently in prison), whose conditions made him more vulnerable to a serious COVID infection, and who had an exemplary prison record, including work as a "good mentor for inmates with special needs"); United States v. Ebbers, 432 F. Supp. 3d at 432–33 (granting compassionate release to 78 year old defendant who served 13 years of a 25 year sentence for "egregious" securities fraud, based on his deteriorating physical and cognitive health and court's conclusion that, as the defendant "can do no more harm", the "compassionate thing to do", consistent with Congressional intent as expressed in the First Step Act, is to release him from prison early);[12] United States v. Wong Chi Fai, 2019 U.S. Dist.

---

[12]    Before Brooker clarified that the policy statement only applies to motions brought by the BOP, Ebbers looked to § 1B1.13 and analyzed two of the specified extraordinary and compelling categories in that policy statement, the "Medical Conditions Note", and the "Age of Defendant Note". 432 F. Supp. 3d at 427–29. Based on the language of each application note, the court distinguished the two categories, concluding that the "Medical Condition Note applies to a defendant younger than 65 who has a specific life-ending or debilitating illness with a predictable, dire short-term prognosis", while the "Age of Defendant Note . . . applies to senior-citizen defendants who have already spent over ten years in prison and whose physical and cognitive deterioration has impaired basic human functions without regard to whether their conditions, other than aging, are terminal", and also without regard to whether the senior-citizen defendant has shown "a substantially diminished ability to provide self-care", a circumstance a court can still consider, but which is not required in order to find an older defendant's circumstances extraordinary and compelling.

Lexis 126774, at *1-4, *8-9, *13 (E.D.N.Y. July 30, 2019) (granting compassionate release to 65 year old defendant who had served, with a spotless record, 26 years of a life sentence imposed for extortion and racketeering conspiracies; whose multiple surgeries, radiation and chemotherapy treatments for thyroid cancer make it difficult for him to eat or swallow or maintain a healthy weight, making the "last three years of [his incarceration a] medical purgatory"; and whose age and deteriorating health qualified him for compassionate release "independent of the fact that he suffers from a terminal medical illness").

Finally, while "rehabilitation alone" may not qualify as an extraordinary and compelling circumstance under the statute, courts consistently agree that a defendant's exceptional achievements during incarceration may be considered in conjunction with other factors to make a request for compassion all the more worthy. *See* United States v. Hasanoff, 2020 U.S. Dist. LEXIS 199816 at *6-16 (S.D.N.Y. Oct. 27, 2020) (granting compassionate release to defendant who served 10 years of an 18 year sentence, based on defendant's changed family circumstances and "extraordinary record of rehabilitation"); United States v. Rodriquez, 2020 U.S. Dist. LEXIS 181004, at *6-14 (S.D.N.Y. Sept. 30, 2020) (granting compassionate release to reduce defendant's sentence of life without parole to 30 years, based on COVID risks to defendant with underlying medical conditions, harsher and more punitive conditions

of confinement created by COVID pandemic, and "remarkable" evidence of defendant's rehabilitation); United States v. Millan, 2020 U.S. Dist. LEXIS 59955, at *30 (S.D.N.Y. April 6, 2020) (granting compassionate release to defendant who had served 28 years of a life sentence, all the while maintaining "a positive outlook and attitude towards life, [seeking] to improve himself to the utmost extent possible, and [being] motivated to do so" without any "tangible incentive other than self improvement").

Based on these authorities, as well as the numerous pre-Brooker decisions granting compassionate release to so many other medically vulnerable inmates during the present pandemic, we sincerely urge this Court to grant Gregory Scarpa, Jr., the same relief bestowed on others in similar circumstances. Mr. Scarpa's 69 years and the completion of the past 32 years in prison for racketeering convictions premised on inchoate conspiracy predicates that are no longer deemed violent crimes, is but one branch of the extraordinary and compelling circumstances that support such leniency. In addition, Mr. Scarpa's health has severely declined in the past five years since his surgeries, radiation and chemotherapy for Stage IV nasopharyngeal cancer, a condition that is thankfully still in remission, but may yet return.

Further, like the defendants in Hansen and Wong Chi Fai, Mr. Scarpa has had great difficulty swallowing food since his life-saving surgeries and therapies, procedures for which he is ever

42

grateful even though they have made his existence in prison these past five years just as much of a medical purgatory.  He is unable to eat the usual prison meals and relies for sustenance on cold cuts, bread, pudding, and a concoction of Carnation Nutritional Supplement mixed with milk, adding ice cream and cookies in an effort to maintain his weight.  And even when attempting to ingest this poor fare – in the solitary confines of his cell because he cannot eat quickly enough to join others in the dining hall for his meals, and because the prison has not assigned anyone to look in on him during his meals to assure his safety – he routinely chokes when food becomes lodged in the cavity left in his throat after the removal of a large tumor, and because he can no longer produce sufficient saliva to swallow since his salivary glands were damaged by radiation therapy. Medical records indicate that this condition is "getting worse", and while Mr. Scarpa has thus far avoided more than momentary asphyxia, his inability to swallow has resulted in his diagnosed malnutrition.

Mr. Scarpa's experience with cancer and its after effects are his most serious medical issue to date, and one he has met with good spirits and a positive attitude since his original diagnosis some six years ago. He has, however, a number of other medical and neurological challenges to face going forward, including his current difficulties with hypertension and memory loss that may be a precursor to dementia.  Mr. Scarpa takes the medications the

43

prison medical unit has prescribed for these conditions and many others, yet his hypertension is not well controlled and his cognition and memory are still below normal according to the regular mental state examinations he has taken over the past two years.  Prisons are not, of course, hospitals or family homes where someone with such serious medical issues can receive the kinds of individual care that could best reduce the suffering created by these conditions.

In addition, the COVID pandemic that has now reached Mr. Scarpa's Iowa prison is another complication and serious risk for anyone of his age and with his medical vulnerabilities. Prisons are just the sort of congregate settings that allow infections to flourish and spread among those who cannot socially distance themselves, and whose access to basic hygiene may not be optimal. While Mr. Scarpa has avoided infection thus far, no one is guaranteed continued luck on that front, and we must all take necessary precautions.  For Mr. Scarpa, those precautions are only available in the safety of a family home where he can quarantine when necessary, not in a prison setting where his risk of serious infection is as obvious as this Court has elsewhere observed.

Surviving a global pandemic in a prison setting is the best outcome an inmate can hope for, but it also comes at a price. To stem the spread of the COVID virus, inmates at Mr. Scarpa's prison have been locked down and subjected to harsher than usual

conditions of confinement, deprived of such basic amenities as
daily showers, losing the comfort of in person family visits for
the past seven months, and risking further medical complications
when followup treatment for chronic conditions must be postponed.
These aspects of the present global health crisis also support a
deserving inmate's compassionate release since such harsh
conditions could not have been anticipated at the time of a
defendant's original sentencing, as other courts have agreed.
United States v. Pacheco, No. 12-CR-408 (JMF), 2020 U.S. Dist.
Lexis 134510 (S.D.N.Y. July 29, 2020) (because defendant confined
in prison is "indisputably at a higher risk of contracting and
dying from COVID-19 than if he were subject to home confinement",
the "health risk that continued incarceration poses to him" makes
§ 3553(a) factors "weigh heavily in favor of [defendant's]
release"); accord United States v. Benjamin, No. 15-CR-445, 2020
U.S. Dist. Lexis 168644 (S.D.N.Y. Sept. 15, 2020)(granting
compassionate release to defendant who had served 108 months of 124
month sentence for his participation in violent acts, in part due
to the "unexpectedly harsh conditions" of the defendant's
incarceration for the past six months, and the fact that § 3553(a)
factors "take on a different weight today in light of the
pandemic"); United States v. Britton, No. 17-CR-260 (LTS), 2020
U.S. Dist. Lexis 142860 (S.D.N.Y. Aug. 10, 2020) (court granted
compassionate release after finding that "harsh and stressful

conditions under which [defendant] has been confined during the pandemic", that his own medical vulnerabilities create a "disincentive . . . to engaging in behavior that could put him at risk of return to confinement", and that the "significant portion of his lengthy sentence that he has served" sufficiently satisfied § 3553(a) factors of personal and general deterrence).

These are all extraordinary and compelling circumstances that we urge this Court to agree support Mr. Scarpa's compassionate release, permitting him the care his family and fiancee are ready and willing to provide, and sparing him the prospect of a severe and life-threatening illness if he is unable to avoid a COVID infection in prison. Beyond these circumstances, however, Mr. Scarpa's history in prison and his accomplishments are of the highly commendable and remarkable sort that, when combined with all other factors, well support a conclusion that Mr. Scarpa is a rehabilitated individual who is worthy of the compassion the law now allows this Court to bestow.

Again, Mr. Scarpa's prison record over the past 32 years is practically unblemished, and includes more than one instance of honorable and even extraordinary achievement. He has completed dozens of programs over the years, all taken for the purpose of self-improvement and without expectation of any other benefit. He managed to uncover information from a convicted domestic terrorist about the exact location where explosive components were hidden,

46

allowing authorities to safely recover and remove them from a residential neighborhood, thereby averting a serious risk to the public. He previously earned the support of staff at the federal ADMAX prison in Colorado who arranged for his transfer to a safer state prison in 2011. Since his arrival in Iowa, he has worked as a mentor who helped inmates with special needs as they prepared for their release, earning the commendation of his warden. After this worked had to be interrupted by his treatment for cancer, he returned to the Iowa prison and studied wood-working to make himself useful building furniture for not-for-profit organizations, government agencies and schools. He has throughout this time maintained his status as a "Tier 3" inmate who enjoys the most privileges because he has earned the trust of prison officials through his behavior and programming.  And while Mr. Scarpa is no longer officially working as a mentor, he continues to counsel younger inmates about life and the ways to avoid the mistakes he made in his own.

Mr. Scarpa has also maintained close ties with his family members and enjoys their continuing support. Unlike his own father, Mr. Scarpa made sure that his children did not follow his bad example, and he is proud that each is living a legitimate life today, with children of their own.  He also met and formed a committed relationship with a good woman who is ready to help Mr. Scarpa become as much of a contributing member of society as his

47

health will permit. Thanks to his sister, Mr. Scarpa has a job waiting for him as well, and he will be able to work on the company's invoicing and inventory remotely from home, as we have all learned to do.

These are the circumstances that we ask this Court to find are extraordinary and a compelling basis to conclude that, given his age, his deteriorating medical conditions, and the 32 years he has spent doing so well in prison, Gregory Scarpa, Jr., is a man who deserves this Court's compassion. The Court should therefore grant either Mr. Scarpa's outright release, or his release conditioned on a period of home confinement and any other requirements that the Court believes will best assure Mr. Scarpa's successful reintegration into his family and society for his remaining years.

## Conclusion

In the 32 years since his incarceration began in 1988, Gregory Scarpa, Jr., has been punished in harsher ways than either of his sentencing courts could have foreseen.  He has nevertheless stayed the course and attempted to make a positive difference whenever he could, all the while spending his time pursuing all available programming and maintaining a commendable and commended prison record that best demonstrates the man he has become. His transformation is plain to those who know him, as well as those who have come to know him in recent years, including the young inmates he has mentored over the years, his devoted family, and his fiancee

48

who is committed to his future, despite the health challenges that future is very likely to include. He is, in sum, a candidate worthy of this Court's compassion, and we ask the Court to exercise its broad sentencing discretion to reduce his term of imprisonment to allow Mr. Scarpa to spend his remaining days surrounded by cherished family members, in a loving home where he can be both protected from the present pandemic, and where his age and medical conditions will receive the individualized care they require.

Dated:  New York, New York
        October 30, 2020

                                    Respectfully submitted,


                                    _____/s/_____
                                    GEORGIA J. HINDE
                                    Attorney for Defendant
                                      GREGORY SCARPA, JR.
                                    228 Park Avenue South
                                    Suite 33276
                                    New York, NY 10003
                                    (212) 727-2717