KT:PEN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                       Docket No. 94-CR-1119 (ERK)

GREGORY SCARPA, JR.

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE DEFENDANT'S MOTION
<u>FOR A REDUCTION IN HIS SENTENCE</u>


                                     SETH DᴜCHARME
                                       Acting United States Attorney
                                       Eastern District of New York
                                       271 Cadman Plaza East
                                       Brooklyn, New York 11201


Patricia E. Notopoulos
Assistant U.S. Attorney
    (Of Counsel)

The government respectfully submits this memorandum of law in opposition to the defendant Gregory Scarpa, Jr.'s motion for a reduction in his sentence.  See Motion to Reduce Sentence, filed October 30, 2020 (United States v. Gregory Scarpa, Jr.,  04 CR 1119 (ERK), DE 1049). [1]

PRELIMINARY STATEMENT

Scarpa is not entitled to a reduction of as a compassionate release.  Scarpa has not met his burden to demonstrate that he, personally and individually, falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release.  18 U.S.C. § 3582(c)(1)(A).  While Scarpa bases his motion on his poor health, his record of rehabilitation evidenced by his "excellent" institutional behavior and cooperation with law enforcement and risks associated with COVID 19, Scapa has not met his burden to justify a sentence reduction as he does not have a terminal illness as his cancer is in remission, his institutional conduct has been disciplinary-ridden, his cooperation has been largely false and his COVID 19 risk is minimal.  Even if Scarpa could meet his burden to show that release is permitted—which he cannot—it would nevertheless remain unwarranted.  The same Section 3553(a) factors considered at sentencing must be considered in weighing a motion for release and weigh against his release today.

BACKGROUND

Scarpa was tried in 1998 in the Eastern District of New York on a superseding indictment, charging him with racketeering conspiracy (18 U.S.C. § 1962(c)), financing

---

[1]        "DE," "PSR," "T," "GX," and "SA" refer to entries in the district court docket in the instant case (04-CR-1119),  the Pre-Sentence Report, the trial transcript, government trial exhibits and Sealed Appendix (DE 40) in United States v. Gregory Scarpa, Jr., United States Court of Appeals, 16-0303, respectively.

extortionate extensions of credit (18 U.S.C. § 893), conspiring to make extortionate extensions of credit (18 U.S.C. § 892), conspiring to use extortionate means to collect an extension of credit (18 U.S.C. § 894(a)(1)), conducting an illegal gambling business (18 U.S.C. § 1955), and conspiring to defraud the United States by impeding the collection of income taxes (18 U.S.C. § 371).

Trial began on September 9, 1998 with jury selection. On October 23, 1998, the jury returned a verdict finding Scarpa guilty on all counts. With respect to the racketeering conspiracy, the jury found that the government had proved four predicate acts of murder conspiracy, although it did not find proved five predicate substantive acts of murder and an additional murder conspiracy. The district court (Raggi, J.) sentenced Scarpa to a total of 482 months' imprisonment, five years of supervised release, a fine of $25,000, and a special assessment of $600. Judgment was entered on June 1, 1999. On direct appeal, this Court affirmed Scarpa's conviction and sentence. United States v. Scarpa, 4 F. App'x 115 (2d Cir. 2001).

On July 11, 2002, Scarpa filed a pro se motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. On March 20, 2006, Scarpa filed a supplemental motion that sought a reduction of sentence pursuant to Fed. R. Crim. P. 35(b) based upon the claim that the government had improperly refused to make such a motion on Scarpa's behalf after Scarpa had provided information to the FBI in 2005. On March 26, 2009, Scarpa stated that he was "willing to forego" his § 2255 claims if the court granted his motion for a sentence reduction.

On January 4, 2016, the district court (Korman, J.) issued a memorandum and order granting Scarpa's motion for a sentence reduction. On February 4, 2016, the court entered a second amended judgment resentencing Scarpa to a total prison term of 362 months. The government appealed the district court order to the Second Circuit Court of Appeal, which reversed the Court's order reducing Scarpa's sentence.

<u>STATEMENT OF FACTS</u>

I.      <u>Scarpa's Criminal Activity</u>

      A.      <u>Scarpa and his Crew</u>

Scarpa was a soldier in the Colombo Organized Crime Family of La Cosa Nostra ("the Colombo family").  Beginning in approximately 1980, he was part of a violent organized crime crew (hereinafter "the crew") which had headquarters at, among other locations, the "Wimpy Boys" social club on 13th Avenue in Bensonhurst.  (T 675-77, 2386-87).  The crew was involved in large-scale loansharking, numbers running, illegal sports betting, credit card fraud, extortion, bank burglary, and drug trafficking.  (T 2407).  It also committed frequent acts of violence, including murder.

Scarpa was a "boss" of the crew and supervised other crew members in all of these illegal activities.  (T 2386).  He reported to the crew's captain, Anthony Scarpatti.  (T 672, 2400).  Scarpa's father, Gregory Scarpa, Sr., was also a member of the crew.  (T 677, 1350, 2395-401).

In 1987, various members of the crew, including Mario Parlagreco, Kevin Granato, and Billy Meli, were arrested and charged with participating in Scarpa's marijuana business, among other things.  (T 645-46, 661, 1395, 2639) (the "Narcotics Case").  They were convicted and sentenced to significant prison terms.  (T 647, 857).  <u>See</u> <u>United States v. Scarpa</u>, 913 F.2d 993 (2d Cir. 1990) (affirming convictions of members of Scarpa's crew in the Narcotics Case). Scarpa himself became a fugitive in the Narcotics Case but was captured in 1988 and subsequently convicted at a separate trial.  He was sentenced to a 20-year prison term.  (T 755, 798-800, 1395). <u>See</u> <u>United States v. Scarpa</u>, 897 F.2d 63 (2d Cir. 1990) (affirming Scarpa's conviction in the Narcotics Case).  He was subsequently prosecuted in the present case for additional criminal activities.

B.     Scarpa's Criminal Businesses

The proof at trial showed Scarpa's involvement in extensive and varied criminal enterprises.  Scarpa was a partner in a loansharking business with his father.  (T 694, 2424).  The business had approximately 30 to 40 loanshark customers who received extortionate loans in amounts as high as $50,000 at interest rates ranging from 1.5 to 3 percent per week.  (T 2428, 2431).  Scarpa also financed other loansharks.  Many of his loansharking customers were themselves members of the crew, who received loans from Scarpa at interest rates of one to one-and-a-half percent per week and then loaned the money out to non-crew members at higher rates.  (T 692-93, 2424-27).

Scarpa also ran an illegal lottery.  Approximately 20 numbers runners collected a large number of small bets in different Brooklyn neighborhoods every day and brought the funds to Scarpa at the Wimpy Boys' Club.  (T 699-701, 2347-48).

Moreover, he was also the boss of an extensive marijuana trafficking business in which he was assisted by at least nine other crew members and as many as 20 additional employees.  (T 839, 2446-47).  The group sold marijuana at five different locations in Brooklyn and Staten Island.  (T 2446-47).  Additionally, Scarpa and his crew were also involved in drug dealer "shake-downs."  Narcotics traffickers were told to pay tribute to the crew or they would be put out of business.  (T 2451).

The crew ran an extensive illegal sports gambling business.  (T 2489-91).  At its peak, the business took in $1 million in bets per week.  (T 1362-64).

Finally, Scarpa and the crew committed large-scale tax fraud by, among other things, filing false tax returns, failing to file tax returns, destroying financial records, failing to

5

issue W2 and IRS 1099 forms, and purchasing assets in false names to conceal ownership.  (See, e.g., T 1362, 1422, 1431, 1463, 2512-14; GX 751A-C, 751E-K, 751M).

C.    Scarpa's Murder Conspiracies

In the summer of 1981, the Colombo family leadership and crew captain Anthony Scarpatti ordered Scarpa to kill a crew associate named Robert "Bucky" DiLeonardi, who was using drugs and publicly bragging about the crew's bank heists.  (T 706-07, 2539-40).  On July 16, 1981, Scarpa lured DiLeonardi to a secluded spot on Staten Island and shot him in the head. (T 707-08, 711, 2546).

In approximately 1981, Scarpa had a dispute with a limousine driver named Alfred Longobardi.  (T 713-14, 1192, 2547).  Scarpa sought and received approval from Scarpatti to murder Longobardi.  (T 717, 2548).  After one unsuccessful attempt, Scarpa helped to formulate a plan in which Scarpa's father and crew member Joseph DeDomenico would hire Longobardi's limousine and murder him in the vehicle.  (T 724, 2555).  On July 2, 1982, Scarpa, Sr. and DeDomenico successfully carried out the plan.  (T 725-30, 2556-58).

In January 1983, crew member Bill Meli learned that his childhood friend, Sal Cardaci, had "ratted" to the police about Meli's theft of a car.  (T 734, 2560).  Meli informed Scarpa, who decided that Cardaci should be killed and obtained permission to commit the murder from Scarpatti.  (T 736-38, 2560).  Scarpa and his crew decided to murder Cardaci by luring him to a store that Scarpa operated on 13th Avenue in Bensonhurst.  (T 739-41, 2561).  Meli told Cardaci to come to the store to participate in a burglary of the business next door.  When Cardaci arrived, crew member Carmine Sessa shot and killed Cardaci.  (T 744-45, 2564-65, 2570).  Scarpa then ordered the crew members to clean up the blood, strip Cardaci's body, and bury it in the basement of the store.  (T 744, 2566).

In 1985, crew member Anthony Frezza killed an associate of the Gambino crime family.  (T 770, 2620).  In response, the leadership of the Colombo and Gambino crime families agreed to kill Frezza.  (T 772, 2621-23).  The task was assigned to Scarpa.  Frezza was lured to Scarpa's house on Staten Island, where Scarpa shot him in the head.  (T 773-75, 2623-26, 2630).  The body was then delivered to the Gambino family at a pre-arranged location on Staten Island.  (T 776, 2633-36).

In 1987, Scarpa became suspicious that crew member DeDomenico was committing lucrative crimes without sharing the proceeds with other crew members.  (T 781, 2583).  Scarpa obtained Scarpatti's permission to kill DeDomenico.  (T 790, 2595-98, 2617-19).  On September 17, 1987, Scarpa and other crew members murdered DeDomenico and left his body in a car on a Brooklyn street.  (T 793-96, 2589-95).

In 1988, Scarpa suspected that Anthony Coco, who managed Scarpa's store and had helped cement the hole in which Cardaci's corpse was hidden, had told law enforcement Scarpa's location while Scarpa was a fugitive.  (PSR ¶ 42).  Scarpa directed crew members to kill Coco.  (Id.).  The task of killing Coco was assigned to Mazza and James DelMasto, who staked out Coco at numerous locations, including Coco's home, with the intention of shooting him.  (Id.).  Ultimately, Mazza and DelMasto stopped looking for him.  (Id.).

II.     Scarpa's History of Obstruction of Justice

    A.      Perjury at Trial

        1.     Scarpa's Testimony

Scarpa testified at his trial that he had been inducted into the Colombo family in approximately 1975 with the express approval of the FBI in order to hide the fact that his father was an informant.  (T 3143-45).  Scarpa claimed that, when he became a member of the family,

its leaders had agreed that he could keep his "hands clean." (T 3143). Scarpa further alleged that, at the direction of the FBI, he had adopted a "posture" as an organized crime boss connected with a crew on the street in order to help the government catch terrorists, including the 1993 World Trade Center and 1996 Atlanta Olympics bombers. (T 3034-44, 3060-61).

Scarpa testified that all of the crew's illegal profits went to his father and other crew members, not to him. (T 3151-53). He admitted his involvement in illegal gambling and loansharking but claimed that he was only helping his father. (T 3078-83).

Scarpa denied involvement in the murders of DeDomenico, Frezza, DiLeonardi, Longobardi, and Cardaci. (T 3160-62). He testified that he was told that his father had murdered Frezza. (T 3025-26). He claimed to have been devastated to learn of DeDomenico's death. (T 3160).

On cross-examination, Scarpa denied involvement not only in the charged murders, but also in violence of any sort. (T 3280-81). He denied even hitting anyone, except for one assault that he claimed that the FBI had ordered him to commit. (T 3214-16).

The government cross-examined Scarpa about a statement he had made in a proffer session with the government in 1996, in which Scarpa had admitted participating in conspiracies to murder Longobardi and crew member Cosmo Catanzano. Scarpa denied involvement in these conspiracies and also denied having made the admissions in his proffer session. (T 3191-92).

### 2. Scarpa's Effort to Preclude the Rebuttal Case

Following Scarpa's testimony, the government informed the court that it intended to call as a rebuttal witness an FBI agent who would testify that, in the 1996 proffer meeting, Scarpa had admitted his involvement in the Longobardi and Catanzano murder conspiracies. Scarpa sought to preclude this testimony on the ground, inter alia, that the government's contention

that Scarpa had admitted being involved in the Catanzano and Longobardi murder conspiracies was "[n]ot consistent" with defense counsel's recollection of the proffer session.  (T 3182). Counsel represented that he was prepared to testify that Scarpa had not made those admissions.  (T 3255).

The prospect of Scarpa's calling his own counsel as a fact witness raised the specter of a mistrial.  (T 3256).  Scarpa proposed, in the alternative, that the court preclude the testimony of both defense counsel and the government witness regarding the 1996 proffer.  (Id.).  The government argued that the court should declare a mistrial rather than preclude the government from presenting evidence of Scarpa's admissions at the 1996 proffer.  (T 3257).

Eventually, defense counsel submitted his notes of the proffer session to the court for review.  The notes appeared to contradict counsel's representations about what Scarpa had said about the Longobardi and Catanzano murder conspiracies.  (T 3629, 3637-38).  The court indicated that, given the inconsistencies between counsel's representations and the notes, a hearing would be necessary to determine precisely what counsel would say on the witness stand.  (T 3626-3628).

Scarpa refused to permit his counsel to testify at a hearing.  (T 3626, 3628).  Instead, defense counsel provided the court with a proffer of his proposed testimony.  (T 3633-34). However, when the court asked counsel about apparent inconsistences between this proffer and his notes, Scarpa refused to allow counsel to answer the court's questions.  (T 3635-3636)). Instead, the defense requested that the court either preclude the government's proposed rebuttal testimony entirely or require the government to stipulate to the proposed testimony of the FBI witness and defense counsel.  (T 3639).  The court rejected the proposed stipulation on the ground that it appeared misleading in light of defense counsel's notes.  (T 3639-40, 3643).  The court then reiterated that it would not preclude the government's rebuttal case without a hearing, and, when

9

Scarpa again refused to permit counsel to testify, the court denied the motion.  (T 3644, 3646, 3648).

       3.    The Rebuttal Case

On the government's rebuttal case, FBI Special Agent Michael Resnick, who had attended Scarpa's proffer session, testified that Scarpa had admitted participating in a conspiracy to murder crew member Cosmo Catanzano in 1987 after Scarpa's father had received information that Catanzano was "a weak link," meaning that he might cooperate with the government. Although Scarpa claimed that he had "disagreed with that information," he nevertheless instructed crew member Mario Parlagreco to dig a grave for Catanzano in Staten Island.  The plan never came to fruition because Catanzano and others in the crew were arrested in the Narcotics Case.  (T 3740-51).

Resnick testified that Scarpa had also admitted participating in the conspiracy to murder Longobardi.  Scarpa recounted the initial, failed attempt in which Scarpa himself had intended to shoot Longobardi outside Longbardi's residence but had to abort the plan when Longobardi's son unexpectedly came out of the house.  Scarpa stated that, in the subsequent, successful attempt, crew member Joe Brewster killed Longobardi while Scarpa waited several blocks away in a "crash car."[2]  (T 3744-47).

       4.    Scarpa's Surrebuttal Testimony

After Resnick's testimony, Scarpa retook the stand and disputed Resnick's testimony about his statements at the proffer session.  Scarpa asserted that he had stated at the

---

[2]    A "crash car" was a car that would follow the shooter's getaway car and crash into law enforcement vehicles, if necessary, to insure that the shooter escaped.  Scarpa instructed his crew members to use crash cars during murders.  (T 2537-38).

proffer that he had opposed his father's plans to murder Catanzano and Longobardi and that he

had been nowhere near the scene of the crime when Longobardi was murdered.  (T 3756-59).

     5.    Judge Raggi's Perjury Finding

At sentencing, Judge Raggi imposed an obstruction-of-justice enhancement based

upon Scarpa's perjured testimony at trial, finding as follows:

> [T]he Court considers you to have boldly perjured yourself at trial
> in a deliberate attempt to obstruct justice in his case.  You lied about
> a variety of material matters, denying the homicide conduct that you
> were charged with, whether committed as a substantive murder or a
> conspiracy. . . . The jury found, and I couldn't agree with them more,
> that, in fact, you regularly conspired to commit murders.

(Sealed Appendix, United States v. Gregory Scarpa, Jr., Court of Appeals Docket (16-0303) at

115).

     B.    The Yousef "Cooperation"

While incarcerated in the Metropolitan Correctional Center in Manhattan pending

trial in this case, Scarpa contacted the government and claimed that he had obtained valuable

terrorism information from fellow prisoner Ramsey Yousef, who was awaiting trial on charges

related to his participation in the 1993 World Trade Center bombing.  The FBI, in conjunction

with the United States Attorney's Office for the Southern District of New York ("SDNY"),

vigorously pursued leads from the information provided by Scarpa.  After expending substantial

investigative resources, the FBI and SDNY came to believe that Scarpa's cooperation was, at least

in part, a "scam," intended to waste government resources and that, in any event, the information

Scarpa provided was useless.

At sentencing, Scarpa accused the government of bad faith in failing to reward him

for his purported cooperation.  Judge Raggi determined, based in part upon sealed submissions

from the SDNY prosecutor, that the government had not acted in bad faith.  While not definitively

resolving the question (which was unnecessary to her decision), Judge Raggi nevertheless noted that Scarpa's purported cooperation "may, indeed, even have been a scam."

     C.    <u>Attempts to Exculpate Other Colombo Family Members</u>

     In the 1990's, the Colombo family experienced an internal war (the "War") between two rival factions, one loyal to the incarcerated boss Carmine Persico and the second to the acting "street boss" Victor Orena. Scarpa was in prison during this time, but his father was the most prolific murderer for the Persico faction. Many members of the Persico and Orena factions, including Orena, his trusted captain Patty Amato, and the brothers Anthony and Joseph Russo were prosecuted for murders committed during the War.

     During litigation of the War cases, it was revealed that Scarpa, Sr. had been a long-time informant for the FBI. There were allegations that Scarpa, Sr.'s FBI handling agent, Special Agent Lindley DeVecchio, had protected Scarpa, Sr. from prosecution for serious criminal activity in an effort to preserve his status as an informant. In fact, it was alleged that DeVecchio had tipped off Scarpa, Sr. to Scarpa, Jr.'s imminent arrest for the Narcotics Case, which resulted in Scarpa, Jr.'s initial flight. Most serious was the implication that DeVecchio had turned a blind eye to indications that Scarpa, Sr. was killing members of the Orena faction during the War.

     Based upon these allegations, Orena, Amato, and the Russos filed motions to overturn their convictions for murders committed during the War. They relied in part upon affidavits submitted by Scarpa in which Scarpa blamed DeVecchio and his father for the murders. This claim carried on the theme of Scarpa's perjured trial testimony that the relationship between DeVecchio and his father was behind the murders for which he was charged. Judge Weinstein, who had presided over the trial of Orena and Amato, conducted an evidentiary hearing at which DeVecchio and other key witnesses testified and denied the defendants' motions for dismissal of

the indictment or a new trial.  United States v. Orena, 956 F. Supp. 1071 (E.D.N.Y. 1997), aff'd,

No. 97-2277 (2d Cir. Apr. 20, 1998) (summary order).  Although finding that DeVecchio had

shown "lapses in judgment, failures in maintaining proper perspective and unfortunate slips in

ability to participate in what is an inherently treacherous and ambiguous relationship," Judge

Weinstein also found that the claim that DeVecchio had deliberately attempted to assist Scarpa's

father during the Colombo family war had been shown by "overwhelming evidence to have been

demonstrably false and an egregious distortion of the record."  Id. at 1103-04.

      Orena and Amato renewed their motions years later based upon Scarpa's testimony

that Scarpa, Sr. had confessed that he and DeVecchio had committed the murders of which Orena

and Amato had been convicted.  After hearing Scarpa's testimony, Judge Weinstein denied the

defendants' renewed motions, specifically finding Scarpa "to be not credible."  Orena v. United

States, 299 F. Supp. 2d 82, 84 (E.D.N.Y. 2004).  The court noted that, because Scarpa and his

father had been sentenced to lengthy prison sentences, they "had good reason to want to further

damage the reputation of the F.B.I. and to help their erstwhile friends, and sometimes adversaries,

Amato and Orena."  Id.

      A motion by the Russos to vacate their convictions was denied by Judge Sifton,

who also found that Scarpa's testimony was not credible.  See Russo v. United States, No. 03-cv-

2059, slip op. at 56-57 (E.D.N.Y. Nov. 24, 2004).

III.    Scarpa's Post-Conviction Motions

    A.    Section 2255 and Rule 35(b) Petitions

      On July 11, 2002, Scarpa filed a pro se motion to vacate, set aside or correct his

sentence pursuant to 28 U.S.C. § 2255, alleging that his trial counsel had a possible conflict of

interest, his appellate counsel had provided ineffective assistance, the government had failed to

disclose <u>Brady</u> material, and other claims relating to rulings and events at his trial and sentencing. On March 20, 2006, Scarpa filed a supplemental motion that sought a reduction of sentence pursuant to Fed. R. Crim. P. 35(b) (the "Rule 35(b) Motion"). That motion was based upon the claim that the government had improperly refused to make such a motion on Scarpa's behalf after Scarpa had provided information to the FBI in 2005 that led to the discovery of a cache of explosive components in the former residence of Oklahoma City bombing defendant Terry Nichols.

       1.     <u>Scarpa's Rule 35(b) Motion</u>

      In October 2006, Judge Raggi transferred Scarpa's case to Judge Korman, who appointed counsel to represent Scarpa. On March 26, 2009, Scarpa, through counsel, renewed his Section 2255 claims but also stated that he was "willing to forego the Court's determination of the ineffective assistance and other trial-related issues . . . if the Court or the government agreed that Mr. Scarpa's on-going efforts to offer his substantial assistance . . . warrant some downward adjustment of his sentence." The motion defined substantial assistance as Scarpa's provision of information concerning the cache of explosive components at the Nichols house and his unspecified assistance to the Kings County District Attorney's Office's case against DeVecchio.[3] Scarpa also asked to be released to a "less severe" correctional facility. Scarpa claimed that the government's refusal to file a Rule 35(b) motion was not rationally related to the government's "legitimate interest in rewarding those who come forward with information that potentially saved lives and averted danger." (SA 154).

---

     [3]     The Brooklyn District Attorney's Office eventually charged DeVecchio with assisting Scarpa Sr. in committing murder. (SA 178-80). The case was later dismissed.

2.     The Government's April 28, 2010 Response

On April 28, 2010, the government filed a response stating that its refusal to file a Rule 35(b) motion was aimed at "maintaining the integrity of the process of cooperation by not rewarding individuals such a defendant who repeatedly attempt to pervert the criminal justice system by obstructing justice and placing their personal interests above the public's interest in honest criminal proceedings." (SA 185). This included his commission of crimes charged in the present case while he was incarcerated on the Narcotics Case, Judge Raggi's determination that Scarpa had committed perjury at his trial on the present indictment, Judge Weinstein's finding that Scarpa gave testimony that was not credible in attempting to exculpate fellow leaders of the Colombo family, and his prior provision of sham cooperation in the Ramsey Yousef matter. (SA 188).

3.     February 22, 2012 Conference

At oral argument on February 22, 2012, the government reiterated its opposition to a sentence reduction for Scarpa. The government emphasized that Scarpa was a "notorious" member of the Colombo family who was twice convicted of RICO and that his conviction in this case involved four murder conspiracies. The government further argued that Scarpa received a fair and just sentence by Judge Raggi, which included an obstruction of justice enhancement based upon his perjured testimony. (Id.). The government also noted that Scarpa had previously been provided a chance to cooperate with the government but that he had never been fully honest about his criminal activity and that his Yousef cooperation had been a scam. The government pointed to the perjured affidavits that Scarpa submitted to the court in an attempt to falsely exculpate fellow members of the Colombo family. Finally, the government argued that, in addition to the

information about the weapons cache, Scarpa "embellishe[d]" the information (i.e., to suggest the threat of a second bombing).

4.    The District Court's Decision

The district court granted Scarpa's Rule 35(b) motion.  The Court acknowledged that the decision whether to file a motion for a reduction of sentence is "generally" left to the government's discretion ((quoting United States v. Rexach, 896 F.2d 710, 713 (2d Cir. 1990)), but that relief would be warranted if the prosecutor's refusal to file the motion lacked "a rational assessment of the cost and benefit that would flow from moving" for a sentence reduction (quoting Wade v. United States, 504 U.S. 181, 187 (1992)).  The court concluded that the government failed to make that "rational assessment" Id.  It then considered each of the government's "conflicting" reasons for refusing to file the Rule 35(b) motion and rejected them.

In conclusion, the court stated that, while the government has a compelling interest in discovering bombs hidden by domestic terrorists and encouraging the assistance of those who have information about those weapons, "[i]t does not . . . have any interest in making use of such truthful and accurate assistance, but arbitrarily failing to credit it based on unsubstantiated allegations." (emphasis in original). Having ruled that the government's reasons for refusing to file the Rule 35(b) motion were "not legally sufficient," id., the court then considered various factors that were relevant to determining the extent of the sentencing reduction.  Taking into account the significance of the information that Scarpa provided, his post-offense rehabilitation, and the likelihood that he will die within five years from cancer, the court concluded that a 10-year reduction in sentence was appropriate.

5.    The Government's Appeal

The government appealed the Court's granting of Scarpa's Rule 35(b) motion to the Second Circuit Court of Appeals.  In its brief, the government argued that the district court applied an erroneous legal standard in finding that, in refusing to make a motion on Scarpa's behalf pursuant to Fed. R. Crim. P. 35(b), the government failed to undertake a "rational" balancing of the costs and benefits of making such a motion.  The government further argued that the district court erred in finding that the government's reliance on Scarpa's history of criminal activity and obstruction of justice was merely a "post-hoc rationalization" for its refusal to make a Rule 35(b) motion on Scarpa's behalf when documentary evidence submitted by the defense showed that Scarpa's history was the primary reason for the government's decision.  Finally the government asserted that the district court's findings concerning Scarpa's cooperation in 2005 were based upon an erroneous legal standard and failed to consider evidence submitted by the defense that supported the government's version of the facts.   Government Brief, United States v. Scarpa (16-303).

6.    Court of Appeals Decision

The Second Circuit reversed the district court   The Circuit acknowledged that there was "no question that the government has an interest in locating illegal stores of explosive materials and preventing them from causing harm to the public; and there is no question that Scarpa's information eventually provided substantial assistance in locating the cache of explosives components hidden in Nichols's former home." United States v. Scarpa, 861 F. 3d 59, 71 (2nd Cir. 2017).  But, it held that "the government does not have an obligation to make a Rule 35(b) motion, and a defendant's furnishing substantial assistance is not in itself sufficient to require such a motion."  The Circuit further held that the evidence "amply support[ed] the government's contention that its refusal to make such a motion for Scarpa was based on legitimate government

concerns," citing to the fact that Scarpa had committed perjury at his trial; in two other criminal cases he had submitted affidavits that the respective presiding judges found could not be credited; and, most relevantly, he had purported to cooperate with the government with regard to terrorism plans by Yousef while instead actively misleading the government and affirmatively compromising the investigative efforts he caused it to undertake." Id. at 71-72.

ARGUMENT

IV.    Scarpa Has Not Carried His Burden to Demonstrate Extraordinary and Compelling Reasons For His Immediate Release

The Court should reject Scarpa's motion on the merits, as he has not carried his burden to demonstrate "extraordinary and compelling" reasons for his immediate release and, in any event, the factors set forth in 18 U.S.C. § 3553(a) counsel against release.

A.    Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment. . . after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).  The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13.  That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. —

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

(i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id. § 1B1.13 Application Note 1.

Even if a court finds "extraordinary and compelling reasons" making a defendant eligible for release, the 18 U.S.C. § 3553(a) factors still govern whether release is warranted.  See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

The Guidelines and Bureau of Prisons ("BOP") policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or registered partner.  See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009).  As the court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner."  Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

Scarpa notes that "the Court of Appeals has most recently clarified in [United States v.] Brooker, 2020 U.S. App. Lexis 30605, at *13-14, *17- 18, that a sentencing court's broad discretion and independent determination of what circumstances are "extraordinary and compelling" enough to support compassionate release are not confined by § 1B1.13 when a motion is, as here, filed by a defendant instead of the Bureau of Prisons."  (DE 1094:37).  The government respectfully submits that Brooker was wrongly decided.

As set forth in the government's brief to the Second Circuit in Brooker, in 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons."   The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13.  Indeed, the Court in

Brooker appears to recognize that the Sentencing Commission can amend § 1B1.13 and thereby revoke the authority that Brooker confers on the Court, see 2020 WL 5739712, at *4 — a fact that establishes conclusively that Congress did not intend for courts to exercise that authority.

As a matter of statutory interpretation and common sense, it is clear that, in the First Step Act ("FSA"), Congress intended the concept of "compassionate release" and the phrase "extraordinary and compelling reasons" to have their long-understood meanings.  See United States v. Palozie, 166 F.3d 502, 504 (2d Cir. 1999) (explaining that Congress's "use of the same language—in essentially the same context—carried with it the meaning" previously ascribed to the language).[4]  Accordingly, district courts in this Circuit and elsewhere have concluded that § 1B1.13 bears on Congress's intent in enacting the FSA, even if it no longer binds district courts. In United States v. Ebbers, for example, Judge Caproni concluded that § 1B1.13 is "anachronistic," but explained that it "is, nonetheless, helpful in defining a vague standard."  432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020).  And in United States v. Thrower — decided after Brooker — Judge Ross concluded that, although "[t]he Sentencing Commission's policy statement explicating 'extraordinary and compelling reasons' under § 3582(c)(1)(A)(i) is not binding on a district court, . . . it does provide some guidance."  No. 04-CR-903 (ARR), 2020 WL 6128950, at *3 (E.D.N.Y. Oct. 19, 2020).[5]  Indeed, the Brooker panel acknowledged this Congressional intent by concluding

---

[4]     See also Lorillard v. Pons, 434 U.S. 575, 581 (1978) ("So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." (internal citations omitted)).

[5]     See also, e.g., United States v. Morel, 2020 WL 3412907, at *2 n.2 (S.D.N.Y., 2020) ("Because no policy statement speaks to motions made independently by the defendant, the statement at U.S.S.G. § 1B1.13 is useful, but not binding, guidance on such motions."); United States v. Vandegrift, No. CR19-52 RSM, 2020 WL 5747808, at *2 (W.D. Wash. Sept. 25, 2020) ("The contents of the policy statement provide persuasive guidance but do not constrain the Court's discretion in determining whether extraordinary and compelling circumstances justify compassionate release."); United States v. Butler, No. 10-CR-612, 2020 WL 5369753, at *2 (E.D.

that Congress intended § 1B1.13 and its corresponding application note to apply to motions brought by the BOP, and by failing to offer any legal support for its conclusion that Congress intended the phrase to have one meaning as applied to the BOP, and a different meaning when applied to district courts.  What follows from this analysis is that — even assuming <u>Brooker</u> is correctly decided — Congress granted district courts "discretion to grant compassionate release motions on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in Application Note 1 to U.S.S.G. § 1B1.13."  <u>United States v. Pinto-Thomaz</u>, 454 F. Supp. 3d 327, 329 (S.D.N.Y. 2020).[6]

---

Pa. Sept. 8, 2020) ("While Congress has not defined the term "extraordinary and compelling reasons," the Sentencing Commission's policy statement provides persuasive guidance on its meaning."); <u>United States v. Williams</u>, No. 00 CR 237 (VM), 2020 WL 4735353, at *2 (S.D.N.Y. Aug. 14, 2020) ("Section 1B1.13 of the United States Sentencing Guidelines ("Section 1B1.13") provides guidance on the circumstances under which "extraordinary and compelling reasons" exist, including, but not limited to, serious medical conditions such as "a terminal illness" or "end-stage organ disease."); <u>United States v. Ludwig</u>, No. 14-CR-00043 (KJM), 2020 WL 4547347, at *3 (E.D. Cal. Aug. 6, 2020) ("In resolving the instant motion, this court, as it has in other similar cases, considers the Sentencing Commission's policy statement as guidance, without determining whether it is binding in this context."); <u>United States v. Garcia-Zuniga</u>, No. 19-CR-4139 JM, 2020 WL 3403070, at *2 (S.D. Cal. June 19, 2020) ("With this legislative intent in mind and without current guidelines from the Sentencing Commission, the court views the 2018 Guidelines as persuasive but not binding."); <u>United States v. Head</u>, No. 08-CR-00093-KJM-2, 2020 WL 3180149, at *2 (E.D. Cal. June 15, 2020), as amended (July 1, 2020) (collecting cases and explaining that "[m]any courts in this circuit have nonetheless 'turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a reduction in sentence.'"); <u>United States v. Smith</u>, No. 16-CR-48 (MPS), 2020 WL 1903160, at *2 n.3 (D. Conn. Apr. 17, 2020) (citing cases for proposition that, after the FSA, § 1B1.13 provides "helpful guidance" on the meaning of "extraordinary and compelling reasons"); <u>United States v. Beck</u>, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019) ("Although there is no policy statement applicable to a defendant's motion for compassionate release, the old policy statement does provide some assistance.").

[6]    <u>See also, e.g.</u>, <u>United States v. Johnson</u>, No. 98-CR-860 (ARR), 2020 WL 2124461, at *3 (E.D.N.Y. May 5, 2020) (denying motion for compassionate release on family-related ground because the proffered basis was insufficiently "similar" to the categories set forth in § 1B1.13 cmt. n.1(C)(i)–(ii)); <u>United States v. Lisi</u>, 440 F. Supp. 3d 246, 250 (S.D.N.Y. 2020) (quoting <u>Ebbers</u>, 432 F. Supp. 3d at 427, for proposition that § 1B1.13 remains helpful guidance in interpreting § 3582(c)(1)(A)).

As the proponent of release, Scarpa bears the burden of proving that "extraordinary and compelling reasons" exist.  See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Gotti, 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

    B.    <u>The Court Should Not Grant Scarpa's Motion for Compassionate Release</u>

        1.    <u>There Are No Extraordinary and Compelling Circumstances Justifying Release</u>

Scarpa asserts that the totality circumstances, which includes his poor health, his rehabilitation evidenced by his "excellent" institutional behavior and cooperation and the risks associated with COVID 19 constitute an extraordinary and compelling reason for relief under 18 U.S.C. 3582.  Scarpa has not met his burden in proving such relief is warranted.[7]

        a.    <u>Health Concerns</u>

The gravamen of Scarpa's motion focuses on his history of nasopharyngeal cancer. While his initial diagnosis was Stage IV, which, as the Court previously noted has a 38% survival rate over five years, the defendant has passed that five-year mark and is currently cancer free.  See United States v. Scarpa, 155 F. Supp. 234, 236 (E.D.N.Y. 2016).  Therefore, Scarpa is not suffering from a terminal illness at this time.  While the after effects of his treatment have left him with dysphagia, or difficulty swallowing, this condition has existed since at least 2015.  It resulted from the removal of his salivary glands, which has impeded his ability to produce sputum.  See Medical Records Submitted under seal ("Med. Rec.") at page ("p.") 2.   While this condition is no doubt

---

[7] It appears that Scarpa has exhausted his administrative remedies.

difficult to bear, this condition does not appear to be the cause of deteriorating health to the extent that Scarpa can be classified as having a terminal illness.[8]

Scarpa's dysphagia increases the risk of his choking on his food.  A medical record dated 9/24/19 indicated that his dysphagia "may [cause Scarpa] to choke on foods if not cut up small and well chewed."  (Med. Rec. at p. 15).  In a report dated 6/16/15, a health professional offered to order a soft food diet for Scarpa, but Scarpa refused.  Scarpa instead stated that he would not benefit from the soft diet but only wanted permission to eat food in his room; he explained that he could have more time to properly chew his food and have adequate liquids.  (Med. Rec. at p. 2).  While Scarpa has asked his institution's permission to have someone stay with him while he eats to protect him if he having a serious choking episode, Scarpa has been able to negotiate his choking episodes for over four years.[9]  Thus, while dysphagia is regrettable, it is manageable, such as by chewing food well, and does not represent a terminally deteriorating condition.

Scarpa's also complains that the dysphagia is causing him to suffer debilitating weight loss and, accordingly, he submitted testimonials from family members who describe Scarpa as though he is wasting away.  The medical reports submitted by Scarpa belie that characterization. A medical report dated 8/3/16, noted that Scarpa "appears healthy however it is apparent that he has lost weight "compared to his baseline weight prior to treatment."  (Med. Rec. at p. 3.)  Thus, Scarpa's cancer treatment caused an initial weight loss.  That report noted, however, that Scarpa had a history of "noncompliance" taking "ensure," which is a well-known nutritional supplement

---

[8] Scarpa also submits a laundry list of other medical issues.  None of these issues are life-threatening.  The medical staff at his institution appears to be attentive to these problems, and Scarpa is not complaining about his treatment.

[9] Interestingly Scarpa only submitted page one of a two-page document that contained his dialogue with prison officials related to this request for a companion.  While page one demonstrates that prison officials were attempting to find the right person for the job, it would be relevant to learn the content of the complete conversation.  See 1049-1:56.

and meal substitute. See https://ensure.com/health-articles-tips/nutrition/complete-balanced-nutrition. In fact, the report stated that "[Scarpa was found to have 46 bottles of Ensure in his cell." Id. Moreover, that 8/3/16 report also noted that Scarpa's weight was 162 pounds. Id. The last medical report which was submitted by Scarpa, dated 9/20/19, showed that Scarpa weighed 169.8 pounds. (Med. Rec. at p. 15). Thus, it appears that Scarpa's weight has remained stable over three years' time. Additionally, in an application to BOP for a compassionate release dated May 10, 2019, Scarpa stated, "I also suffer with hypothyroid issues making maintaining my weight difficult…." (DE 1049-1:4). Thus, based upon the meager medical documentation provided by Scarpa, there is no evidence that Scarpa's eating problems are causing severe weight loss and, in fact, his refusal to accept a soft diet or take Ensure may have contributed to whatever weight loss he has had.

Defense counsel cites to United States v. Hassan, 2020 U.S. Dist. Lexis 61946, and United States v. Wong Chi Fai, 2019 U.S. Dist. Lexis 126776, as examples of cases where compassionate release was granted based upon facts similar to Scarpa's case. To the contrary, both cases involved defendants who were clearly suffering from terminal conditions and were near the end of life. In Hassan, the defendant, whose sentence was viewed as excessive following the filing of an 851enhancement, had only seven months remaining on his sentence; was in all likelihood in the midst of a relapse of his prostate cancer; and was suffering from dementia to the degree that he was failing to function in prison. Hassan's also suffered from a host of other serious ailments, including diabetes, tuberculosis, and glaucoma. These illnesses left him quite frail and at risk of serious illness if infected with COVID-19. Hassan at *23-25. In the Wong Chai Fai case, the defendant, having refused surgery to forestall his advancing cancer, was terminally ill

and had only approximately 12 months to live.  Wong Chai Fai at *3.  None of Scarpa's medical conditions, in contrast, have a terminal diagnosis.

While the defendant submits anecdotal evidence from fellow prisoners and family members that portrays Scarpa as being in a rapid decline into dementia, medical tests show that he Scarpa only suffers from a "mild neurocognitive disorder, which, at best, can represent a precursor to dementia or Alzheimer's disease.  (DE 1049: 35-26).  However, Scarpa currently does not have those diseases, and he is taking medication to forestall progression into those diseases.  (DE 1049: 5).  More important, the defendant remains functional within his prison environment wherein he currently maintains a job.

While the defendant's complains that BOP failed to consider his medical conditions when his application for compassionate release was denied, this contention is belied by the BOP denial letter that referred to many of the Scarpa's medical conditions.  See DE 1049-1: 38. Moreover, it is clear that BOP, when evaluating Scarpa's compassionate release application, acknowledged Scarpa's medical problems but focused on the fact that these problems did not diminish his ability to function within the institution.  See DE 1049-1; 7, 27, 38.  As one BOP response, dated August 13, 2019, BOP stated, "You are independent and are not experiencing deteriorating mental or physical health that substantially diminishes your ability to function in a correctional environment.  Your current facility is able to manage your medical needs at this time. (DE 1049-1:7; 27).

Thus, compassionate release is not justified.  Scarpa's health problems are not ones in which he "is not expected to recover," nor debilitating to the extent that he cannot "provide self-care within the environment of a correctional facility."  See U.S.S.G 1B1.13, application note 1. Should the Court believe the defendant's condition to be otherwise, and given the stability of the

defendant's current health, the government asks the Court, as Scarpa had suggested, to issue an order directing probation to supplement the presentence report to independently evaluate Scarpa's current medical status.[10]  See DE 1049: 50.

b.    "Excellent" Institutional Behavior

While Scarpa suggests he has had an "excellent" record while incarcerated, BOP records show that his behavior has been a far cry from "excellent."  See DE 1049:32.  Even though the government has not had sufficient time, despite a request to BOP, to obtain the defendant's disciplinary records at his current institution, which is a state facility, his records while in BOP custody reveal a substantial history of infractions.  See BOP disciplinary records attached as Exhibit A.  These infractions include possession drugs in 1991; use of martial arts, boxing in 1991; refusing to obey an order in 1992; possessing a dangerous weapon in 1992; unauthorized physical contact in 1994; assault with serious injury in 1995; lying to staff in 1996; and giving another inmates name when making a call in 1999.   Moreover evidence in the instant case showed that Scarpa engaged in criminal activity while in prison.

Although there is no record of BOP infractions from 1999 until his transfer to the state facility in 2011, this was no doubt due to the fact, during this period of time, he was housed at the ADMAX facility in Florence, Colorado, under very strict supervision.   See United States v. Mumuni, 946 F.3d 97, 112 (2d Cir. 2019) (noting that while defendant's "compliance with institutional regulations has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a)," if "[b]y contrast, [the defendant had] failed to abide by institutional

---

[10]   The government attempted to obtain Scarpa's recent medical records, but, given the fact that the defendant is in a state facility, BOP was unable to obtain the records by the filing of his motion.

regulations, his continued disrespect of the rules would suggest a greater need to protect the public from further crimes and to deter future criminal conduct").

The defendant also cites to his cooperation, and in particular his role in uncovering a cache of explosives in the former residence of Oklahoma City bomber Terry Nichols, as an example of his rehabilitation.  The government's position on this matter was well-documented in the litigation surrounding Scarpa's attempt to obtain a reduction of sentence under Rule 35, which showed that Scarpa took false credit for the information, embellished information related to the explosives, failed a polygraph related to the truthfulness of his conduct and refused to fully cooperate with law enforcement. [11]  This devious conduct, combined with Scarpa's perjury during his attempt to exculpate members of the Colombo family, negate any claim of rehabilitation. While the government is fully aware that the Court disagrees with the government's view of the value of the Scarpa's so-called cooperation, and the Court's belief that Scarpa deserved a sentence reduction for his cooperation, the appropriate vehicle for rewarding a defendant for cooperation post sentence is a Rule 35(b) motion, and the government does not believe that Scarpa should be allowed to co-opt the compassionate release process to gain credit for cooperation through the back door.

In sum, Scarpa has a history of self-serving, manipulative misconduct while incarcerated such that rehabilitation cannot be considered grounds for his compassionate release.

c.      COVID-19

Finally, the defendant asserts that his susceptibility to COVID 19 at the Iowa State Prison ("ISP") where he is incarcerated justifies release.  While Scarpa accurately describes an October outbreak at the ISP when approximately 34 inmates became infected with COVID 19, the

---

[11]  The government incorporates by reference the Court record related to the Rule 35 motion, including all briefs, status conferences and the appellate docket.

matter was quickly brought under control.   According to the Iowa Department of Corrections website, as of November 8, 2020, no inmates at ISP have active COVID 19 infections.   There have been no deaths.   See http://doc.iowa.gov.   Thus, it appears that the facility is very capable at protecting its inmates.  To combat the pandemic, the prison instituted procedures, including, but not limited to, suspending all visiting and volunteer activities; having all employees fill out a questionnaire and submit to temperatures checks prior to entering the facility; screening new inmates for infection; quarantining and testing of inmates displaying symptoms; and continually disinfecting high traffic areas.  Id.  Thus, due to the ISP's competent handling of their outbreak, the defendant appears to have a low risk of infection.  See United States v. Granados-Valencia, 14-CR-622 (S-1) (ARR), Dkt. Entry No. 83, at 6 (E.D.N.Y. June 17, 2020) (denying motion for compassionate release in part because "the BOP has reported no confirmed cases of COVID-19 at FDC SeaTac, where the defendant is currently incarcerated").

It should be noted that Scarpa declares that, if released from prison, he plans to move to Florida, which is a state that has an increasing infection rate and takes few precautions to protect its citizenry.  See https://www.fox13news.com/news/florida-following-countrys-upward-covid-19-case-trend; http://www.sun-sentinel.com/opinion/editorials/fl-op-edit-desantis-covid-numbers-20201028-a26ckiotjbbjtbacbf7ffxsbty-story.html.  Thus, Scarpa may truly be safer in the ISP than in Florida.

Moreover, while the defendant classifies himself as having a compromised immune system, Scarpa has not submitted medical records that substantiate this claim.  While cancer treatment compromises a patient's immune system, systems can return to normal after treatment. See https://www.nm.org/about-us/northwestern-medicine-newsroom/nm-news-blog/how-long-after-chemotherapy-is-my-immune-system-compromised.   Based upon the lack of definitive

medical evidence on the status of Scarpa's immune system, as well as the precautions taken by ISP, Scarpa has failed to justify release based upon a risk of COVID 19 infection.

In sum, the defendant does not meet the criteria of U.S.S.G 1B1.13 or its application notes for compassionate release.  Even if the Court disregarded these standards, Scarpa has failed to show compelling and extraordinary circumstances that would justify release.

2.     The Section 3553(a) Factors Strongly Weigh Against Scarpa's Release

Were the Court to find compelling and extraordinary grounds for compassionate release, an analysis under Section 3553(a) nonetheless strongly weighs against Scarpa's release. See 18 U.S.C. § 3582(c)(1) (requiring courts to consider the factors set forth in section 3553(a) to determine whether release is warranted); U.S.S.G. § 1B1.13 (requiring courts to determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," prior to releasing a defendant); see also Gotti, 2020 WL 497987, at *2 ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification.  He is simply eligible for a sentence modification.  The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

As detailed above and set forth more fully during Scarpa's trial, the defendant participated in the Colombo family as the head of a powerful and violent crew of that criminal enterprise.  As the Court is well aware, the Colombo family, like other organized crime families, is a pernicious organization that utilizes violence, including murder, to further its interests.  The

defendant's membership in and criminal association with the Colombo Family reflect his commitment to its violent goals.  Indeed, the defendant was personally involved in multiple murder conspiracies, among many other crimes, all of which underscore the deadly seriousness of the defendant's offense and his danger to the community.

Scarpa's propensity for violence on behalf of the Colombo family was well documented at trial and has been demonstrated by his conduct in prison (where he seriously assaulting an inmate, whom the government believes was a high-ranking member of organized crime).  Scarpa personally shot DeLeonardi in the head; ordered the murder of Longobardi because he had a personal dispute with him; ordered his crew to clean up Cardacci's blood after he was murdered and to bury Cardaci in his basement; shot Anthony Frezza in the head; participated in the murder of DiDomenico; and ordered the murder of Coco.  Given the breadth and severity of Scarpa's criminal conduct, Judge Raggi sentenced Scarpa to a 486-month term of imprisonment.

Significantly, the risk of danger is not mitigated by the type of cooperation offered by the defendant.  Members and long-term associates of organized crime families within La Cosa Nostra, such as the defendant, rarely disassociate themselves from the enterprise and its goals. Indeed, the extreme reluctance of members and associates of organized crime to cooperate with law enforcement is emblematic of this overarching loyalty.   His actions in attempting to falsely exculpate Orena, Amato and the Russos show his continued loyalty to the Colombo family. Scarpa's other alleged cooperation was designed to either aid organized crime or was to inculpate individuals who were not involved in organized crime for his personal benefit.  Thus, if released, Scarpa stands ready to capitalize on his allegiance and apparent steadfast loyalty to the Colombo family.

Moreover, the nature and circumstances of the offenses of which Scarpa was convicted and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct all militate against Scarpa's release.  Releasing Scarpa now would be counter to the goals of sentencing and the factors set forth in Section 3553(a), and thereby is reason alone to reject Scarpa's application for compassionate release.  See, e.g., United States v. Gioeli, No. 08-CR-240 (BMC), 2020 WL 2572191, at *5 (E.D.N.Y. May 21, 2020) (denying the compassionate release motion of a defendant, who was convicted of racketeering with predicate acts including murder but had tested positive for COVID-19 antibodies, in part because of the defendant's "callous disregard for human life" when balancing the Section 3553(a) factors).

## CONCLUSION

For the foregoing reasons, Scarpa's motion for compassionate release should be denied.


Dated: Brooklyn, New York
       November 9, 2020

                              Respectfully submitted,

                              SETH DᴜCHARME
                              Acting United States Attorney

                      By:     ___/s/_____
                              Patricia E. Notopoulos
                              Assistant United States Attorney
                              (718) 254-6354


cc:     Georgia Hinde, Esq.  (via ECF and email)